[No. 27482-5-II.   Division Two.   March 15, 2004.]

THE STATE OF WASHINGTON, *Respondent*, v. JACOB MELVIN KORUM, *Appellant*.

688

*Monte E. Hester* and *Wayne C. Fricke*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Paul D. Weisser, Senior Counsel*, and *Gerald A. Horne, Prosecuting Attorney*, and *Kathleen Proctor, Deputy*, for respondent.

HUNT, C.J. — Jacob Melvin Korum appeals his convictions for multiple counts of burglary, assault, robbery, and kidnapping, with multiple firearm sentencing enhancements, arising from a conspiracy with friends to rob drug dealers in a series of non-injury home invasions. Korum argues that we should reverse his convictions because (1) his right to speedy trial was violated, (2) the trial court improperly denied his motions to sever the firearms charge and to grant a continuance, (3) prosecutorial misconduct violated his right to due process, (4) the kidnapping evidence was insufficient and incidental to the robberies, (5) the trial court made evidentiary errors, and (6) the trial court misstated the law in its accomplice-liability jury instruction. Korum also challenges his 1,208-month sentence as excessive, alleging prosecutorial vindictiveness in retaliation for withdrawing his guilty plea and exercising his right to jury trial.

We find no reversible error in the jury's verdict. Nonetheless, we dismiss the kidnapping convictions as incidental to the robberies as a matter of law.

We also hold as a matter of law that the prosecutor acted vindictively in adding charges following Korum's exercise of

his right to trial. These charges, together with the original charges, resulted in a sentence 10 times longer than the sentence imposed following Korum's earlier guilty plea, and 5 times greater than the longest sentence given to a codefendant. Accordingly, we dismiss the 15 new counts that the State added after Korum withdrew his plea (Counts 17-22, 24-32); and we remand to the trial court to determine any additional remedy for prosecutorial vindictiveness, including dismissal of other charges, and for resentencing commensurate with Korum's role in the home invasions and proportionate to the sentences of the other perpetrators.

## FACTS

### I. HOME INVASIONS

During the summer of 1997, several young men, some of whom had been friends since childhood, frequently gathered in Ethan Durden's garage and used drugs. They planned a series of nighttime, armed home invasions to rob known Pierce County dealers of money and drugs, presuming that these victims would not call police. The young men planned to disguise themselves, to invade the homes after midnight, and to bind anyone they encountered inside to facilitate their gathering of items to steal.

### A. McDonnell/Smith Home Invasion

Durden, Brian Mellick, and 19-year-old Korum, armed and wearing ski masks, invaded John McDonnell and Gregory Smith's condominium. At gunpoint, the robbers (1) restrained Smith with duct tape, (2) dragged him across the floor, and (3) stole methamphetamine, which they divided among themselves. Korum searched the home for money and more drugs, coming close enough that Smith could smell alcohol on Korum's breath and recognize his voice, body style, and "signature" work boots. Smith also recognized Durden's voice.

## B. Attempted Apodaca/Tegge and Fox/Campbell Home Invasions

Marcos Apodaca was inside the residence he shared with Tami Tegge when he saw a group of men outside. He opened the door. An armed man in camouflage clothing appeared and said, "[G]overnment agent, get on the ground." Report of Proceedings (RP) at 1328-31. Apodaca slammed the door shut, and the men left.

Michael Bybee, Durden, Mellick, Zack Phillips, and Korum then attempted to invade the home of Aldrich Fox and Angela Campbell. Their initial effort was unsuccessful.

## C. Fox/Campbell Home Invasion

The group met at Durden's garage and returned to the Fox/Campbell home, this time bringing walkie-talkies so that they could communicate during the robbery. Three dressed in camouflage clothing and the other two, one of whom was Korum, wore masks to conceal their appearances. Approaching the house, they (1) identified themselves as police officers as they broke through the front and rear doors; (2) used duct tape to restrain Fox, Campbell, and Campbell's two-year-old child at gunpoint; and (3) stole drugs, money, jewelry, and Campbell's car.

## D. Beaty/Molina Home Invasion

At 3:00 A.M. on August 30, 1997, Mellick, Korum, Phillips, Durden, and Bybee drove together in Mellick's car to burglarize and to rob Judy Beaty's home and Tonya Molina's trailer at the same address. Again identifying themselves as police officers, Bybee, Durden, and Mellick (1) entered the dwellings armed; (2) used duct tape and slip ties to restrain seven people (including children) at gunpoint; and (3) stole drugs, money, a car, and other valuables. The robbers yelled at, kicked, hit, and threatened to burn Judy Beaty with acid if she did not say where the money and drugs were. Beaty remained bound for about 20-30

minutes during the robbery and was inadvertently cut when one of the robbers used a knife to remove the zip ties and release her.

The robbers initially tied Beaty's friend Jennifer McDonald to a chair and taped her mouth and eyes. They then took her outside, removed the duct tape from her eyes at her request, and led her into the Molina trailer behind the Beaty residence, where she observed Sherrita Vernon-Thompson, Tonya Molina, and Brandon Vernon-Thompson on their knees on the floor. When Sherrita Vernon-Thompson had yelled at the intruders to produce a search warrant, they had taped her head, except for her nose. The robbers took McDonald to a room and left her there with two unbound children, Miguel Lopez and Robert Lee Warner.

During this time, Korum remained outside in the car, communicating by walkie-talkie with the others inside the residences. He was to drive by while Bybee shot a loud, barking dog; but the dog ran off unharmed when Bybee fired.

In response to a neighbor's 911 call, police arrived, at which point the robbers stopped freeing the victims and fled. The police arrested Mellick, Durden, and Bybee, who had firearms, ski masks, duct tape, and two-way radios in their possession. Korum and Phillips escaped arrest: Korum drove away in the car, and Phillips apparently fled on foot.

## II. Initial Charges

Hoping for a reduced sentence, Mellick offered the police information about several other home invasions, about which police had been unaware, and the other participants. Mellick explained the group's plan—to enter drug dealers' homes, to bind anyone inside, and to rob them of drugs and money. On October 15, 1997, Mellick implicated Korum in three of these other home invasions, in addition to the Beaty/Molina home invasion, where Mellick had been arrested and Korum had fled.

The State developed a theory that the home-invaders comprised a core conspiracy of several friends, including Korum, with one or two entering and leaving the conspiracy at different times. According to Mellick, Korum had been involved in all of the group's home invasions.

Based on this conspiracy theory, on November 13, 1997, the State charged Korum with 16 counts of burglary, kidnapping, robbery, and assault of Judy Beaty, Jennifer McDonald, Sherrita Vernon-Thompson, Tonya Molina, Robert Lee Warner, Brandon Vernon-Thompson, and Miguel Lopez. All 16 counts arose from the Beaty/Molina home invasions. The potential maximum sentence for all counts combined was confinement from 122 to 150 years.[1]

By this time, Korum was out of the country. After attending a drug rehabilitation clinic in California, he had left for Mexico, allegedly in response to anonymous threats on his life in Pierce County. A Pierce County warrant for Korum's arrest issued on November 13, 1997. A federal warrant issued on January 9, 1998.

Korum remained in Mexico, even after his father told him about the Pierce County arrest warrant in December 1997 or January 1998. Korum did not return to Pierce County until late January 1998, after his mother told him about the federal arrest warrant. After returning home, Korum waited 10 days before he turned himself in to authorities in February 1998.

On March 20, 1998, Korum filed a motion to dismiss the kidnapping counts because they were incidental to the robberies.[2]

### III. GUILTY PLEA; WITHDRAWAL

In June 1998, the prosecutor offered Korum an opportunity to plead guilty to "enough substantive charges to allow

---

[1] The State also charged Korum's coconspirators, all of whom pleaded guilty in exchange for sentences well below the maximum. Durden was sentenced to 22 years of confinement, the longest sentence received by Korum's codefendants.

[2] The record on appeal does not include the trial court's ruling on this motion. Because the kidnapping charges remained, we assume that the trial court denied the motion.

for 15 years within standard-range," plus a 5-year deadly weapon enhancement. Clerk's Papers (CP) at 186-87. The prosecutor told Korum that if the currently charged cases were resolved by guilty plea, then the State would not file additional charges for other home invasions newly-confirmed by ongoing investigations. The prosecutor refined the plea offer in a letter dated July 22, 1998, which said, in essence: If Korum did not plead guilty, the State would file an amended information containing 32 counts, yielding a potential sentence of 221 to 261 years in prison. The prosecutor attached a copy of this threatened 32-count information to the plea offer.

On July 31, 1998, Korum pleaded guilty to an amended information charging only second degree unlawful firearm possession and one count of first degree kidnapping while armed, in connection with the Beaty/Molina home invasions. In return, the State dismissed the other 16 counts, agreed "not to file any additional charges," and promised to recommend a sentence of 132 months incarceration. Korum acknowledged that, in pleading guilty, he was "receiving benefit of State's reduction of charges." CP at 92.

Korum's father was present when Korum entered his guilty plea, during which time Korum admitted to having been the driver during the August 30 Beaty/Molina home invasions. Korum had previously told his father that he had been present during at least one of the robberies.

At sentencing, Korum apologized to the Beaty family.[3] Several victims submitted statements explaining how terrorized their families had been when the robbers invaded their homes posing as police officers. Sherrita Vernon-Thompson requested that Korum receive a lighter sentence than the others based on her belief that he had suggested taking the children into the bedroom so that they would not

---

[3] The trial court refused to allow questioning of Korum's father about the reasons for his son's guilty plea and apology to the Beaty family. So Korum made an offer of proof that the Beaty family had threatened Korum and his family if he did not plead guilty, saying that he would be much safer in prison than out.

see her "suffocate" from the duct taping. A police officer submitted a statement asking for maximum punishment for all four defendants because of the sophistication involved in posing as police and the resultant diminution of the public's ability to trust police officers.

As agreed, the State recommended 72 months in prison for the kidnapping count, 60 months for the special firearm enhancement, to run consecutively, and a 12-month concurrent sentence for the firearm possession count. Mirroring the State's recommendation, the trial court sentenced Korum to a total of 135 months in prison, followed by 2 years of community placement, broken down as follows: 75 months for the kidnapping; 60 months for the firearm enhancement, to run consecutively; and 12 months for firearm possession, to run concurrently.

In March 2000, Korum successfully moved to withdraw his guilty plea because he had not been properly advised about the mandatory community placement following his prison sentence. The order vacating Korum's guilty plea was filed on March 21, 2000. A duplicate order was filed on May 8, 2000.

The State appealed. In October 2000, the State abandoned its appeal. On December 1, 2000, we issued a mandate dismissing the State's appeal.

## IV. NEW CHARGES

The State filed a second amended information[4] alleging 32 counts, including the original 16 counts for the Beaty/ Molina home invasions and the second degree unlawful firearm count. (Count 23). These charges included 5 counts of first degree burglary, 1 count of attempted burglary, 10 counts of first degree kidnapping, 3 counts of first degree robbery, 3 counts of first degree attempted robbery, 8 counts of second degree assault, and 1 count of attempted second

---

[4] A series of informations and amendments, originally under two cause numbers, were later consolidated. These facts are not germane to this appeal.

degree assault, all while using a firearm, as well as 1 count of unlawful possession of a firearm.[5]

Korum was arraigned on June 13, 2000. On July, 26, 2000, he moved to continue the trial until September, 25, 2000. On August 15, 2000, he moved to continue to October 23, 2000. On October 23, he agreed to continue the trial until March 31, 2001. The trial court set bail and scheduled rearraignment (on consolidated cause numbers) for December 22, 2000. Korum posted bail on December 6, 2000.

On December 22, 2000, Korum was rearraigned; he objected, claiming violation of his right to a speedy trial. He moved (1) to dismiss the charges, arguing that the time for trial had elapsed; (2) to sever the felon-in-possession-of-firearm count, claiming prejudice; and (3) to continue the trial in response to the State's production of 500 pages of telephone records, another 250 pages of discovery, and additional State witnesses. The trial court denied his motions.

## V. TRIAL

Trial began March 14, 2001. Korum objected to Mellick's testimony, focusing primarily on Mellick's stated belief that (1) he (Mellick) would have to submit to a polygraph or lose the benefit of his plea bargain if the police or prosecutor thought he was lying about the robberies and (2) he would receive a benefit once "everyone had pleaded guilty," a comment the court struck.

Detective Knutson testified that (1) he could link Korum to the other perpetrators using a database of police reports and (2) "there was no need" to subject Mellick to a polygraph because Knutson was "able to substantiate [Mellick's] statement." RP at 1639. Korum challenged Mellick's credibility.

---

[5] Counts 1-16 relate to the Beaty/Molina home invasions. Counts 17-22 relate to the Fox/Campbell home invasion. Count 23 is the firearm possession charge. Counts 24-27 relate to the McDonnell/Smith home invasion. Counts 28-32 relate to the Tegge/Apodaca attempted home invasion; Counts 28 and 29, attempted burglary and attempted robbery, duplicate Counts 31 and 32.

On direct examination by the State, Korum's father testified that his son had discussed his general involvement in the robberies. But on cross-examination, Korum's father testified that Korum had "absolutely" "always denied involvement" in the kidnapping, robberies, assaults, and burglaries. The trial court ruled that this testimony opened the door to impeach Korum's father, who earlier (1) had written a letter indicating that his son had admitted involvement in the crimes, and (2) had heard his son admit his involvement in open court. The trial court did not, however, allow the State to elicit from Korum's father that this admission had occurred during Korum's prior guilty plea.

Korum took the stand and denied all charges. He asserted that (1) he had been at the Beaty and Molina residences because Mellick had called him to participate in a drug deal; (2) believing it was a drug deal, Korum had left when the police arrived; (3) he did not learn that it was a robbery until later that day; and (4) he was not involved in the robberies of McDonnell/Smith, Tegge/Apodaca, or Fox/Campbell. Korum did admit, however, that he had joked with friends about having been involved in the McDonnell/Smith robbery.

Korum also attempted unsuccessfully to introduce hearsay evidence that Monica Adrian had been the getaway driver.

The parties stipulated that Korum had prior convictions[6] and read the stipulation to the jury. The State then called Sergeant Sherm Voils, a Pierce County Sheriff and Korum family friend, who testified about difficulties retrieving Korum from Mexico and mentioned that Korum had some trouble with law enforcement in the past.[7]

---

[6] The stipulation did not indicate Korum's prior offenses, second degree theft and taking a motor vehicle without permission.

[7] Korum objected and moved for a mistrial. The trial court denied the motion but instructed Voils to stay clear of the subject of Korum's prior offenses.

Korum admitted having a prior felony conviction and owning and possessing firearms. But he asserted that he did not know it was illegal for him to possess firearms.

In closing, the State (1) argued that it would have charged Mellick with additional crimes if it had discovered that he was not telling the truth, (2) characterized Korum as having "fled" the country, and (3) mentioned Korum's father's testimony about Korum's admitted involvement in the robberies.

The jury convicted Korum of (1) 29 various counts of kidnapping, robbery, assault, and burglary, each while armed, and (2) unlawfully possessing a firearm. It acquitted him of the two counts of attempted robbery and burglary that duplicated other counts.

## VI. SENTENCING

The State recommended an exceptional sentence upward, in essence asking for up to 117 years in prison, including multiple, consecutive, mandatory five-year firearm enhancements, under RCW 9.94A.310.

Three victims appeared at Korum's sentencing and asked for leniency, suggesting that his sentence should not exceed 10 years in prison, as imposed following his earlier guilty plea; none thought that Korum deserved life in prison, especially as compared to his codefendants.

Korum requested an exceptional sentence downward, stressing the gross disparity between the State's posttrial sentence recommendation and (1) the 10-year sentence he had originally received following his guilty plea and (2) the far-lighter sentences given to his more culpable codefendants. He argued that the trial court should impose an exceptional sentence downward because the State had engaged in prosecutorial vindictiveness:

> Obviously, because there's no other explanation to the contrary, this choice of his to exercise his constitutional right has either upset the prosecution to the point that they said that we're going to show you what happens if you do what you're

entitled to do under the constitution, or the prosecution is intending to take this case and/or I should say take this case, find him guilty of all of these things, apply these guidelines in the most harsh way possible for purposes of deterring others in the future from choosing to avail themselves of their constitutional right to go to trial when obviously if we do so in this, we're going to put you away for 200 years.

RP at 2332.

The State responded that there were no proper grounds for an exceptional downward sentence, and that it had not engaged in misconduct:

The State was well within its authority to file the counts that we filed against the defendant. The argument that we acted vindictively is not merited. The Court can make an inquiry as to the motive behind the counts filed by the State. However, the burden is upon the defendant to make a prima facie showing that there's actually vindictiveness or likely vindictiveness. That does not exist here.

We can't be said to be acting vindictively if we would have pursued those counts initially, and that's exactly what the State was doing, and the evidence bears that out. So they cannot establish that there's a chilling effect for his right to choose to go to trial. They cannot establish a prima facie showing that the State has acted vindictively, and they have not stated to this Court a mitigating factor for an exceptional sentence below the standard range.

RP at 2345-46.

The trial court agreed with the State, finding (1) no vindictiveness, (2) that the State had justifiable reasons for amending the information, and (3) no compelling reasons to justify an exceptional sentence downward. Noting that its "role in sentencing was significantly limited by the Legislature's adoption of the Sentencing Reform Act," chapter 9.94A RCW, the trial court imposed consecutive, low-end standard-range sentences for the kidnapping counts. RP at 2349. Korum's sentences on the kidnapping counts, coupled with the multiple firearm enhancements, resulted in a sentence of 1,208 months in prison, over 100 years, even

with the sentences on the other counts running concurrently.

## ISSUE FOCUS

Korum acknowledges that the trial court sentenced him to the low end of the standard range for each of his convictions. He argues, nonetheless, that his total sentence was clearly excessive and disproportionate to his codefendants' sentences. He also asserts prosecutorial vindictiveness and denial of due process when the State charged him with 15 additional counts after he withdrew his defective guilty plea and exercised his constitutional right to jury trial. In addition, he argues that the kidnapping charges were merely incidental to the robberies and, therefore, must be dismissed for lack of evidence.

We focus our discussion on the kidnapping charges being incidental to the robberies and on prosecutorial vindictiveness. In doing so, we address four primary issues: (1) Did the State vindictively charge Korum with additional new counts when Korum withdrew his guilty plea and exercised his right to jury trial, thereby violating Korum's right to due process of law? (2) Can we decide on the record before us or must we remand to the trial court to determine whether the State engaged in prosecutorial vindictiveness? (3) What is the appropriate remedy for prosecutorial vindictiveness and which level of court should decide? (4) Were the kidnapping charges here merely incidental to the robberies such that the kidnapping convictions should be dismissed?

Because our answers to these questions require remand for resentencing, we do not separately address Korum's excessive sentence argument.

## ANALYSIS

### SELECTION OF CRIMINAL CHARGES

■ "[A] public prosecutor is a quasi-judicial officer" who represents the State and must "act impartially."[8] A pros-

---

[8] *State v. Huson,* 73 Wn.2d 660, 663, 440 P.2d 192 (1968), *cert. denied,* 393 U.S. 1096 (1969) (closing argument as prosecutorial misconduct). *See also State v. Reed,* 102 Wn.2d 140, 147, 684 P.2d 699 (1984).

ecutor's duty to do justice on behalf of the public transcends mere advocacy of the State's case:[9] "[T]he prosecutor's ethical duty is to seek the fairest rather than necessarily the most severe outcome."[10] The fairest outcome may include refraining from filing criminal charges legally supported by the evidence if filing those charges will result in statutorily-authorized punishment disproportionate to the particular offense or offender.[11]

■ We acknowledge and respect the "broad ambit to prosecutorial discretion, most of which is not subject to judicial control."[12] Under the Sentencing Reform Act of 1981 (SRA), our legislature has given prosecutors great latitude in determining what charges to file against a defendant. *State v. Lewis*, 115 Wn.2d 294, 299, 797 P.2d 1141 (1990). Nonetheless, the legislature did not leave the prosecutors' discretion unbridled. On the contrary, the legislature limited prosecutors' charging discretion as follows:

(1) The prosecutor should file charges which *adequately* describe the nature of defendant's conduct. *Other offenses may be charged only if they are necessary* to ensure that the charges:

(a) Will significantly enhance the strength of the state's case at trial; or

(b) Will result in restitution to all victims.

(2) *The prosecutor should not overcharge to obtain a guilty plea.* Overcharging includes:

(a) Charging a higher degree;

(b) *Charging additional counts.*

---

[9] *See* H. Richard Uviller, *The Neutral Prosecutor: The Obligation of Dispassion in a Passionate Pursuit*, 68 FORDHAM L. REV. 1695, 1715 (2000).

[10] *United States v. Jones*, 983 F.2d 1425, 1433 (7th Cir. 1993).

[11] Bruce A. Green, *Why Should Prosecutors "Seek Justice"?*, 26 FORDHAM URB. L.J. 607, 623 (1999).

[12] *Hardwick v. Doolittle*, 558 F.2d 292, 301 (5th Cir. 1977), *cert denied*, 434 U.S. 1049 (1978).

This standard is intended to direct prosecutors to charge those crimes which demonstrate the nature and seriousness of a defendant's criminal conduct, but to decline to charge crimes which are not necessary to such an indication. *Crimes which do not merge as a matter of law, but which arise from the same course of conduct, do not all have to be charged.*

Former RCW 9.94A.440(2) (1996), *recodified as* RCW 9.94A-.411(2), subcaptioned "Decision to prosecute" (emphasis added).

In addition to these legislative limitations, there are constitutional constraints on a prosecutor's exercise of discretion in charging crimes:

[A] prosecutor's discretion to reindict a defendant is constrained by the due process clause. . . . [O]nce a prosecutor exercises his discretion to bring certain charges against a defendant, neither he nor his successor may, without explanation, *increase the number of or severity of those charges* in circumstances which suggest that the increase is *retaliation for the defendant's assertion of statutory or constitutional rights.*

*Hardwick v. Doolittle*, 558 F.2d 292, 301 (5th Cir. 1977) (emphasis added), *cert. denied*, 434 U.S. 1049 (1978).

Against this backdrop, we address Korum's assertions of improper kidnapping charges (incidental to the robberies), vindictive prosecution, and denial of due process following withdrawal of his guilty plea and exercise of his constitutional right to trial by jury.

A. "Stacking" or "Pyramiding" of Incidental Kidnappings

■ Korum argues that we should reverse his kidnapping convictions because there was insufficient evidence of restraint in that "all of the kidnapping counts were merely 'incidental' to the robberies." Appellant's Br. at 52. In support, he cites *State v. Green*, in which the Supreme Court held that there was insufficient evidence of kidnapping because the restraint and movement of the victim was merely "incidental" to and not "an integral part of and [was]

independent of the underlying homicide."[13] 94 Wn.2d 216, 227, 616 P.2d 628 (1980) ("While movement of the victim occurred, the mere *incidental* restraint and movement of a victim which might occur during the course of a homicide are not, standing alone, indicia of a true kidnapping."). We agree with Korum that *Green* requires dismissal of the kidnapping charges here because they were incidental to the robberies.

The State originally charged Korum with 16 counts, including 7 counts of kidnapping by Korum's codefendants during the Beaty/Molina home invasions, during which Korum remained outside in the getaway car. The State later entered into a plea agreement with Korum, "combin-[ing] all kidnap victims into one count" because of the "litigation risk" of prosecuting a mere "look-out" driver with multiple kidnapping and other charges. This exercise of prosecutorial discretion appears to have been consistent with the legislature's directives in former RCW 9.94A-.440(2).

In contrast, the State's stacking of multiple kidnapping charges following Korum's plea withdrawal was not consistent with the legislature's directives in former RCW 9.94A.440(2). As the Supreme Court held in *Green*, restraint and movement of a victim that are merely incidental and integral to commission of another crime, such as rape or murder, do not constitute the independent, separate

---

[13] We note Justice Utter's similar combination of evidentiary insufficiency and the incidental nature of the kidnapping in his explanation of *Green* in a later case:

In that case, the defendant had been charged with aggravated first degree murder committed in the furtherance of either rape or kidnapping. We noted that this required separate proof of either the crime of rape or the crime of kidnapping. We then concluded that there was insufficient evidence to support a finding of kidnapping.

*Our conclusion in Green was not, however, based solely on the lack of any restraint but was also based on the fact that what restraint and movement had taken place was incidental to the murder.*

*State v. Vladovic*, 99 Wn.2d 413, 432-33, 662 P.2d 853 (1983) (Utter, J., dissenting) (emphasis added) (citations omitted).

crime of kidnapping. 94 Wn.2d 226-27. In his learned dissent in *State v. Vladovic*,[14] Justice Utter explains,

> Historically, such "pyramiding" of a kidnapping charge upon that for the underlying offense [to obtain more punishment] was a common abuse and has been roundly condemned by the commentators.[15] .... We recognized in *Johnson* [ ][16] that the Legislature's enactment of RCW Title 9A, with its more clearly defined classification of crimes by degree, was intended to eliminate the need to enhance punishment by "pyramiding" charges.

*State v. Vladovic*, 99 Wn.2d 413, 430, 662 P.2d 853 (1983).

We similarly noted this legislative intent in an opinion authored by then Judge Pearson:

> We agree with the rationale of *Johnson* [92 Wn.2d 671, 600 P.2d 1249 (1979)] that the new criminal code, RCW Title 9A, by creating more clearly defined degrees of crimes, demonstrated the intention of the legislature to remove the occasion for pyramiding crimes which had in the past resulted in unjust and oppressive multiple punishments for a single offense. The court also recognized the potential double jeopardy problem inherent in punishing more than once for a single act.

*State v. Ingham*, 26 Wn. App. 45, 49, 612 P.2d 801, *review denied*, 94 Wn.2d 1008 (1980).

For example, the legislature has established more severe punishment for first degree robbery, RCW 9A.56.200, where the robber displays a firearm or injures the victim, as compared to second degree robbery, RCW 9A.56.210. The statutory definition of robbery includes the threat or use of

---

[14] The majority in *Vladovic* found that the kidnappings in that case were not incidental to the robberies. We note, however, that the State in that case did not charge Vladovic with both robbing and kidnapping the same victims. Rather, the State elected to charge only one or the other crime. For example, Vladovic was charged with robbing a Mr. Jensen. He was charged with kidnapping four other people, not Jensen, whom he forced to lie on the floor, binding their hands and taping their eyes, while he robbed Jensen. The court ruled, "Because the injuries of the robbery and kidnappings involved different people, they clearly created separate and distinct injuries." *Vladovic*, 99 Wn.2d at 421-22.

[15] Citing as examples, MODEL PENAL CODE § 212.1, cmt. 2, at 220-22 (1980); Note, *A Rationale of the Law of Kidnapping*, 53 COLUM. L. REV. 540, 556-58 (1953). *Vladovic*, 99 Wn.2d at 430.

[16] *State v. Johnson*, 92 Wn.2d 671, 675-76, 600 P.2d 1249 (1979).

force to obtain property from another or to prevent resistance to taking property. RCW 9A.56.190. That all robberies necessarily involve some degree of forcible restraint, however, does not mean that the legislature intended prosecutors to charge every robber with kidnapping.

On the contrary, as we noted earlier, the legislature has specifically (1) directed prosecutors "to decline to charge crimes which are not necessary [to demonstrate the nature and seriousness of a defendant's criminal conduct]" and (2) admonished that prosecutors need not charge all crimes "which arise from the same course of conduct," including those "which do not merge as a matter of law." Former RCW 9.94A.440(2). As our Supreme Court has explained in an analogous robbery case,

> Once the money had been obtained by force, the robbery was completed. Any incidental abduction or restraint occurring during this short period of time would merge into the robbery as a matter of law. *State v. Johnson*, 92 Wn.2d 671, 676, 600 P.2d 1249 (1979). "[T]he mere *incidental* restraint and movement of a victim which might occur during the course of a [crime] are not, standing alone, indicia of a true kidnapping." *State v. Green*, 94 Wn.2d 216, 227, 616 P.2d 628 (1980).

*State v. Allen*, 94 Wn.2d 860, 864, 621 P.2d 143 (1980) (*abrogated* on issue of merger, not incidental restraint, by *Vladovic*, 99 Wn.2d at 420-21).

The court then cited examples where the kidnapping was merely incidental to the underlying crime:

> *See State v. Johnson*, 92 Wn.2d 671, 600 P.2d 1249 (1979), kidnapping merged with rape in the first degree in a situation where the kidnapping did not have an independent purpose or effect. In other words, the force employed in the kidnapping was the same as that which would support the charge of rape. The injury to the victim did not have a separate and distinct existence from and was merely incidental to the crime of which it formed an element. *See also State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980).

*Allen*, 94 Wn.2d at 864 n.1.

In opposition, the State cites *State v. Brett*, 126 Wn.2d 136, 892 P.2d 29 (1995). But *Brett*, an aggravated murder case, does not apply here because its facts differ substantially. After reciting the elements of first degree kidnapping and the definitions of "abduction" and "restraint," the *Brett* court outlined the following facts that caused the kidnapping "aggravator"[17] to be separate from the robbery and murder:

> The jury had before it evidence that Brett and Martin planned to kidnap well-to-do older victims, take them to a bank, and later kill them. The pair obtained items to facilitate the planned kidnapping, picked a residence at random, and forced their way into the Milosevich home. The jury could rationally have found Brett and Martin were "in the course of" a kidnapping when the plan went awry, and Brett murdered Mr. Milosevich.

*Brett*, 126 Wn.2d at 167.

The court further distinguished the *Brett* facts from cases where the kidnappings were merely incidental to the primary crimes: "This court has held and the State concedes that the mere incidental restraint and movement of the victim during the course of another crime which has no independent purpose or injury is insufficient to establish a kidnapping." *Brett*, 126 Wn.2d at 166.

The State cites another case that is similarly inapplicable: *State v Whitney*, 44 Wn. App. 17, 720 P.2d 853 (1986), *aff'd*, 108 Wn.2d 506, 739 P.2d 1150 (1987). The State charged Whitney with rape aggravated by kidnapping, not with a separate charge of kidnapping as the State did here. The *Whitney* court found that the following facts showed a kidnapping separate from, not incidental to, the rape: Whitney ordered the victim at knife point into his car, forced her down under the dashboard, covered her with his coat, and drove her to another area, where he forced her to disrobe; then he raped her.

---

[17] In *Brett*, the State alleged several aggravating offenses to raise the murder to first degree aggravated murder: robbery, kidnapping, and concealment of the perpetrator's identity.

Here, in contrast, restraining the victims was contemporaneous with the robberies; and aside from the victim in Count 3, who was moved to the next door trailer, there was no removal of the victims from their homes and no transportation under cover to another location. Even as to Count 3, the "kidnapping" was not independent of the robberies. Rather, the robbers moved her from the Beaty home to Molina's trailer on the same property, apparently so she could watch the children in the trailer during the robbery. The victim was with other people, including the trailer's residents. Similar to *Green, supra,* she was not secreted in a place where she was unlikely to be found.

Accordingly, we hold as a matter of law that the kidnappings[18] here were incidental to the robberies for the following reasons: (1) The restraints were for the sole purpose of facilitating the robberies—to prevent the victims' interference with searching their homes for money and drugs to steal; (2) forcible restraint of the victims was inherent in these armed robberies; (3) the victims were not transported away from their homes during or after the invasions to some remote spot where they were not likely to be found; (4) although some victims were left restrained in their homes when the robbers left, the duration of the restraint does not appear to have been substantially longer than that required for commission of the robberies;[19] and (5) the restraints did not create a significant danger independent of that posed by the armed robberies themselves. *See Green,* 94 Wn.2d at 216.

---

[18] The kidnapping counts in the postplea withdrawal amended information were Counts 2, 3, 8-12, 18, 19, and 25.

[19] For example, after gathering what they wanted to steal from the Beaty home, the robbers tried to unbind the victims, stopping when they realized that the police had arrived outside. Immediately after the robbers left the McDonnell home, Greg Smith was able to cut himself free in less than five minutes.

## B. Denial of Due Process

### 1. Plea Bargaining

At the outset, we recognize that

> [p]rosecutorial vindictiveness must be distinguished . . . from the rough and tumble of legitimate plea bargaining.
>
> . . . .
>
> . . . That a prosecutor may offer "hardball" choices to a defendant does not make the process constitutionally unfair, so long as the choices are realistically based upon evidence and options known to both sides.
>
> Just as a prosecutor may legitimately reduce an initial charge as the result of a successful plea bargain, he or she may legitimately increase an initial charge which was filed in the expectation that a fully informed and represented defendant would plead guilty to the lesser charge, when that expectation proves to be unfounded.

*State v. Lee*, 69 Wn. App. 31, 35-36, 847 P.2d 25 (footnote omitted) (citing *United States v. Goodwin*, 457 U.S. 368, 378-80, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982)), *review denied*, 122 Wn.2d 1003 (1993). *See also State v. Bonisisio*, 92 Wn. App. 783, 790, 964 P.2d 1222 (1998), *review denied*, 137 Wn.2d 1024 (1999).

Nonetheless, "[a] prosecutor should not overcharge to obtain a guilty plea." *Lee*, 69 Wn. App. at 36 n.6. *See also* former RCW 9.94A.440(2)(2). Similarly, there are limitations on a prosecutor's discretion to increase charges following vacation of a guilty plea:

> An increase in the severity or number of charges if done without vindictiveness may be easily explained. For example, evidence of the additional crimes may not have been obtained until after the first indictment or information is filed, or the additional crime may not be complete at the time charges are first brought. And a prosecutor may, without explanation, refile charges against a defendant whose bargained-for guilty plea to a lesser charge has been withdrawn or overturned on appeal, *provided that an increase in the charges is within the limits set by the original indictment.*

*Hardwick*, 558 F.2d at 301 (emphasis added, footnotes omitted).[20]

## 2. Prosecutorial Vindictiveness

A prosecutor may not vindictively file a more serious crime in intentional " 'retaliation for a defendant's lawful exercise of a procedural right.' "[21] *Bonisisio*, 92 Wn. App. at 790 (quoting *Lee*, 69 Wn. App. at 35). Yet this is precisely what the State did here.

The record shows that the State was not only aware of possible additional charges at the time of Korum's guilty plea, but it also expressly threatened to file an amended 32-count information with 16 additional charges if Korum did not plead guilty and opted instead to go to trial. Moreover, the State faxed a copy of its threatened 32-count information to Korum, offering to dismiss the other existing charges and to refrain from filing new charges if Korum pleaded guilty to 1 count of first degree kidnapping and 1 count of second degree unlawful firearm possession.

Again, we are mindful that not every increase in charges following plea vacation and trial meets the stringent test for prosecutorial vindictiveness. Cognizant of a prosecutor's broad discretion in filing charges, we do not render our decision here lightly.

### a. Proof and presumption

■ Citing the United States Supreme Court decision in *Blackledge v. Perry*,[22] the Fifth Circuit explains the tension

---

[20] *See also Bordenkircher v. Hayes*, 434 U.S. 357, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978) (due process is not violated when state carries out threat made during plea negotiations to *recharge* accused with more serious offense, on which defendant is plainly subject to prosecution, if he rejects offer to plead guilty to offense originally charged).

[21] A defendant has a procedural right to withdraw a guilty plea under certain circumstances, CrR 4.2(f), and to try his case to a jury. U.S. CONST. amends. V, VI, XIV; WASH. CONST. art. I, §§ 21, 22.

[22] *Blackledge v. Perry*, 417 U.S. 21, 94 S. Ct. 2098, 40 L. Ed. 2d 628 (1974) (vindictive prosecution where the state increased severity of charge after Perry exercised right to trial de novo).

between the prosecutor's broad charging discretion and the accused's right to a vindictiveness-free charging decision:

> The advancement of a prosecutorial vindictiveness claim brings into conflict two antithetical interests: (1) the due process right of the defendant to be *free of apprehension that the state might subject him to an increased potential punishment* if he exercises his right to make a direct or collateral attack on his conviction, and (2) the prosecutor's broad discretion to control the decision to prosecute. . . . A court must "weigh the extent to which allowing the second [prosecution of the defendant] will chill the exercise of the defendants' appeal rights against the extent to which forbidding the second [prosecution] will infringe on the exercise of the prosecutor's independent discretion."
>
> Employing this calculus in *Blackledge*, the Supreme Court found from the circumstances that the interest of the State was completely overborne by the defendant's right to be free of the fear of vindictiveness. The Court therefore held that a due process violation was established by the accused's showing that his second prosecution posed a *"reasonable likelihood of vindictiveness"*, creating an apprehension in future defendants that the state would retaliate against their exercise of constitutional or statutory rights. *No actual vindictiveness or retaliation motive was required to be shown.*

*Miracle v. Estelle*, 592 F.2d 1269, 1272-73 (5th Cir. 1979) (emphasis added) (footnote and citations omitted).

■ To show a "reasonable likelihood of vindictiveness," Korum cites (1) the "severe disparity" between the State's recommendation of a 10-year sentence following his guilty plea and the "horrendous [over 100-year] sentence" that the State recommended after his jury trial; and (2) the "severe disparity" between his 100-year posttrial sentence and the far lower sentences of his codefendants, who pleaded guilty to fewer counts but who were more culpable for the same home invasions with which the State had charged Korum after he withdrew his plea. Br. of Appellant at 65-66.

Underlying this exponential increase in sentencing, in part, was the State's doubling the number of charges after Korum withdrew his guilty plea and requested a trial.

During the plea negotiations, the State had justified its offer to reduce the charges to one count of kidnapping and one count of unlawful firearm possession, in part, because Korum was merely the getaway driver. But after he withdrew his plea, the State charged him with 32 counts for essentially four home invasions, using primarily two legal devices: (1) stacking kidnapping, robbery, burglary, and assault charges for each home invasion, amplified with additional counts where there were multiple people in the home and (2) charging Korum with additional counts for crimes committed by codefendants. The State further increased Korum's potential sentence by adding mandatory, consecutive, firearm sentencing enhancements.[23]

Korum's case is not like *Miracle*, where "at no time during these proceedings ha[d] the state offered an explanation for 'upping the ante . . .' " 592 F.2d at 1277. Here, the State made no effort to hide its reason for "upping the ante" against Korum. Rather, it was clearly following through on its plea-negotiation threat to file a 32-count amendment if Korum exercised his right to trial.

i. Exponential increase in sentence recommendation

By stacking or pyramiding counts, including additional incidental kidnapping charges, the State generated a tenfold increase in the total of Korum's standard-range sen-

---

[23] Firearm enhancements must run consecutively to the underlying sentence for the crimes to which they apply. Whether the enhancements run consecutively to or concurrently with *each other* depends on whether the underlying sentences run consecutively or concurrently according to the sentencing guidelines. *State v. Romero*, 95 Wn. App. 323, 327, 975 P.2d 564 (1999). Moreover, firearm enhancements are not subject to an exceptional sentence below the standard range. *State v. Brown*, 139 Wn.2d 20, 29, 983 P.2d 608 (1999); former RCW 9.94A.310 (1997).

tences,[24] many of which were required to run consecutively. The mandatory firearm enhancements alone, for example, resulted in 50 years of confinement (10 consecutive 5-year sentence enhancements under former RCW 9.94A.310 (1997)). In essence, Korum received a life sentence, the other end of the sentencing spectrum from his postplea 10-year sentence.[25]

We are well aware that a mere difference between the State's sentencing recommendation in connection with a guilty plea and its recommendation following trial does not by itself violate due process.[26] Nonetheless, as United States District Court Judge John Coughenour, Western District of Washington, noted during a recent interview about related separation-of-powers sentencing issues:

> The whole philosophy of the [federal sentencing] guidelines was to eliminate disparity in sentencing. . . . Most judges will

[24] The State had recommended 132 months confinement after Korum's guilty plea. It increased its recommendation to 1208-1410 months after the trial.

[25] *Compare Miracle*, 592 F.2d at 1276:

Miracle was initially tried . . . for robbery with one enhancement conviction, carrying a potential punishment of 5 years to life. The State then retried him . . . for aggravated robbery plus two enhancement convictions. In doing so, the prosecution increased the severity of the original offense in at least two different ways. First, it changed the primary offense in the second indictment from robbery, a second degree felony, to aggravated robbery, a first degree felony. When joined with one enhancement conviction, aggravated robbery authorizes a potential punishment of 15 to 99 years imprisonment, as compared to the potential 5-99 year sentence carried by robbery with one enhancement felony. The aggravated robbery charge was harsher because it would expose Miracle to a minimum 15 year sentence while under the robbery charge he could potentially receive as few as five years.

The State of Texas further increased the charge by adding an additional enhancement conviction. The resulting indictment removed from the jury all discretion to assess a sentence as low as five years and required the accused, as a habitual felon, to be given life imprisonment. Given the vast difference between potential sentences under the two charges, it ignores reality to contend that [the second indictment] did not constitute a more serious offense. Being founded on a harsher charge, the [second indictment and trial] may have created within other defendants a real apprehension of prosecutorial vindictiveness.

(Footnote omitted.)

[26] *Bordenkircher*, 434 U.S. at 359-65 (no due process violation when prosecutor offered a fully informed, represented defendant a plea bargain with charges carrying a five-year term, which defendant freely declined, despite prosecutor's disclosed intention to seek life sentence in event of trial, and defendant was given life sentence upon conviction).

tell you that the disparity will be far greater now because the discretion has shifted to the [prosecutor's] office, and they have a different goal in mind than a judge whose job is justice.

Margaret Graham Tebo, *Questions on Sentences: Changes to Guidelines Become a Separation-of-Powers Dispute*, ABA JOURNAL, July 2003, at 13.[27]

Here, the State asked the trial court to impose exceptional sentences totaling up to 117 years confinement,[28] in spite of the absence of exceptional cruelty or physical harm to person or property (aside from the thefts),[29] in contrast with other typically more violent home invasions.[30] Instead, the State argued that, based on the planning and sophistication involved in these crimes, consecutive standard-range sentences, totaling 100 years, were "clearly too lenient."[31] This characterization of Korum's culpability posttrial differed markedly from the State's characterization of his minimal involvement postplea when the State recommended a sentence of only 10 years, especially where

---

[27] Although this article focuses on a shift in sentencing discretion from federal judiciary to executive, caused by an amendment to the federal Sentencing Reform Act, its explanation of the competing principles involved seems equally applicable to our SRA's similar shift.

[28] More precisely, the State recommended confinement for 1208 to 1410 months.

[29] The judge that originally sentenced Korum following his guilty plea acknowledged this lack of physical harm when he lectured young Korum about the seriousness of his offense:

I think you're almost lucky that somebody didn't get shot and killed. And you would be standing here . . . asking me not to put you in for life—and that might well be the case.

I had one not too long ago, similar circumstances—going in rob—robbing for dope, for money and one of them had a gun, says "I wonder what it's like to kill somebody," blammo. So all of them pled to first degree murder even though only one pulled the trigger.

. . . .

Then you're going to jail for really almost the rest of your life. And in that particular case . . . I think those folks were your age and they're hoping to see daylight before they die.

RP (Sept. 16, 1998) at 49.

[30] *See, e.g., State v. Fryer*, 36 Wn. App. 312, 317, 673 P.2d 881 (1983) (defendant stabbed people during home invasion).

[31] The State also recommended that Korum's firearm enhancements run consecutively to the sentences for *all* offenses, not solely the kidnappings.

the State did not base its exponentially increased sentence recommendation on any additional postplea investigation.

Although some significant increase in sentence recommendation is to be expected when a defendant rebuffs a plea bargain and puts the State to the risk and expense of a trial,[32] nonetheless, this increase cannot be of a magnitude that suggests vindictive retaliation for the defendant's exercise of his right to withdraw a defective guilty plea and to request a trial.[33] Here, other than its changed characterization of Korum's degree of involvement, the State made no attempt to justify the magnitude of its increased sentence recommendation, above and beyond the increase normally expected for a defendant who rebuffs a plea agreement and goes to trial.[34]

### ii. Disparity in coconspirators' sentences

The State's theory at trial was that Korum was essentially an accomplice, a member of a gang on a summertime home-invasion crime spree. The record here shows that Korum's level of involvement in the series of drug-dealer home invasions was not commensurate with that of his codefendants, such as Durden, whom some victims described as the prime actor and who received a 22-year sentence, after pleading guilty.

Clearly these home invasions were violent, dangerous, serious, and unjustified by the robbers' choice of drug-dealer victims. Korum, however, caused no physical harm

---

[32] H. Richard Uviller, *The Neutral Prosecutor: The Obligation of Dispassion in a Passionate Pursuit*, 68 FORDHAM L. REV. 1695, 1714 (2000):

Since docket economy is an ongoing imperative, some discount is probably granted solely in exchange for bypassing the trial and appeal. Projected success with a jury counts too. But underlying the state's accord to a reduction in the top count penalty must be a defensible assessment of the gravity of the crime and the deserts of the defendant.

[33] " '[V]indictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial.' " *Blackledge*, 417 U.S. at 25-26 (quoting *North Carolina v. Pearce*, 395 U.S. 711, 725, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969)).

[34] *See Miracle*, 592 F.2d at 1277.

to the victims. Further, Korum's minimal participation was in stark contrast to the conduct of Durden, a fact the State implicitly recognized when Durden received, as part of his plea bargain, a sentence more than twice the sentence the State had recommended for Korum on pleading guilty.

In *Moore*, we noted the distinction between treating accomplices and principals alike for conviction purposes and treating them differently for sentencing purposes, based on their relative culpabilities:

> We agree with the State that an accomplice and principal should be treated alike insofar as the determination of guilt or innocence is concerned. That does not mean, however, that minimal involvement in criminal activity may not be considered by a sentencing court in determining whether to impose a sentence below the standard range.

*State v. Moore*, 73 Wn. App. 789, 798-99, 871 P.2d 642 (1994).[35]

As a result of prosecutorial vindictiveness here, however, Korum's charges, and consequently his resultant sentences, far exceeded those of his more culpable coconspirators. Even though the trial court imposed low-standard-range sentences for the mandatory consecutive kidnapping and firearm counts and ran the sentences for the other counts concurrently, Korum's sentence still totaled more than 100 years.[36]

In *Moore*, we agreed with the trial court that,

> "[g]iven the Defendant's reduced involvement in the activities, as compared to Mr. Bunney, it makes *more frugal use of the*

---

[35] We further noted in *Moore*:

Here, the trial court's findings support a conclusion that Moore's participation was "significantly out of the ordinary for the crime in question." [*State v.*] *Nelson*, 108 Wn.2d [491, ]501[, 740 P.2d 835 (1987)]. That being the case, the trial court did not err in departing from the standard range due to Moore's limited involvement in the marijuana-stolen property operation.

*Moore*, 73 Wn. App. at 799.

[36] Essentially, Korum's 100-year sentence reflects the statutory mandates that his sentences run consecutively for the 10 kidnapping convictions, former RCW 9.94A.400(1)(b) (1997) (recodified as RCW 9.94A.589(1)(b)), and the 10 firearm enhancements (additional 5 years for each kidnapping). Former RCW 9.94A-.310(3)(e) (1997).

*State's resources* to impose a prison term of 36 months. A prison term of 36 months is proportionate as compared to the State's recommendation for Mr. Bunney who had substantially higher involvement in the offenses. The respect for the law by providing a punishment which is just is enhanced by a 36 month prison term because it will provide sufficient inducement to the Defendant and warning to others that such involvement, even at the Defendant's minimal level, will result in a prison term."

*Moore*, 73 Wn. App. at 794 (emphasis added). Here, the gross disparity between Korum's sentence and those of his coconspirators,[37] several of whom were more highly involved and more violent principals, does not promote respect for the law by providing punishment that is just and evenhanded.[38] Former RCW 9.94A.440(1) (1997).

### b. Summary

When Korum argued prosecutorial vindictiveness below, the trial court ruled that the State had justifiable reasons

---

[37] (1) Durden was sentenced on five counts for 22 years in prison; (2) Bybee was sentenced on five counts for 20 years; (3) Phillips was sentenced on seven counts for 10 years; and (4) Mellick was sentenced on four counts for 8 years.

[38] As the Ninth Circuit recognized in *United States v. Daas*, 198 F.3d 1167, 1181 (9th Cir. 1999),

[A] central goal of the Sentencing Guidelines is to eliminate sentencing disparity. *See Koon* [*v. United States*], 518 U.S. [81,] 113, 116 S. Ct. 2035 [, 135 L. Ed. 2d 392 (1996)] ("The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach towards the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice.").

*cert. denied*, 531 U.S. 999 (2000). The *Daas* court remanded for resentencing because of the sentence disparity between codefendants. It did so because the trial court had not realized it could properly use this disparity as a basis for a downward departure from sentencing guidelines. *Daas*, 198 F.3d at 1180-81.

*See also* Bruce A. Green, *Why Should Prosecutors "Seek Justice"?*, 26 FORDHAM URB. L.J. 607, 634 (1999): "Doing justice" also means that the State should generally treat lawbreakers with rough equality—to treat similarly situated individuals in roughly the same way.

We do not address here the trial court's exercise of discretion not to impose an exceptional sentence downward. Rather, our focus is on the excessive charges filed by the prosecution, which put the trial court in the position of having to impose multiple lengthy sentences, even under the low end of the standard ranges.

for amending the information.[39] We disagree that the extent of the amendment allowed here was justified: After Korum withdrew his plea and requested a jury trial, the State no longer folded the kidnappings into a single count. Nor did it simply reinstate the counts it had dismissed as part of the plea bargain. Instead, the State essentially doubled the number of crimes charged and increased Korum's sentence exposure to a maximum of 261 years confinement. In so doing, the State carried out its threat to file additional charges, which were inflated and stacked, if Korum exercised his right to trial.

As the D.C. Circuit Court of Appeals noted in analogous circumstances,

in neither *Goodwin* [457 U.S. 368, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982)] nor the case at bar had the defendants' own conduct after the initial charging decision given the government a legitimate reason to enhance the charges. These circumstances alone, of course, fail to support . . . prosecutorial vindictiveness . . . . We note them because they combine with other circumstances in the case to suggest a retaliatory motivation.

Perhaps the most important of the circumstances . . . is the government's disparate treatment of the defendants who elected to go to trial and the defendants who elected to forego their trial rights. All of the defendants participated in the same demonstration and conducted themselves in the same manner. Yet the defendants who chose to go to trial faced two charges, whereas the other defendants confronted only one. This disparate treatment must give rise to a suspicion that the government discriminated among the defendants on the basis of their divergent decisions whether to exercise their right to trial. The facts in this case thus support, far more than did the facts in *Goodwin*, a finding of *a realistic likelihood of prosecutorial vindictiveness.*

---

[39] It does not appear from the record that the parties or the trial court distinguished between those counts originally included but dismissed as part of the plea bargain and those new counts that the State added only after Korum withdrew his plea and sought a jury trial.

*United States v. Meyer*, 810 F.2d 1242, 1246 (D.C. Cir.) (emphasis added), *vacated*, 816 F.2d 695, *reinstated*, 824 F.2d 1240 (1987), *cert. denied*, 485 U.S. 940 (1988).[40]

Based on the record before us, we find a "realistic likelihood of 'vindictiveness' "[41] by the State to punish Korum for withdrawing his plea and exercising his right to trial by jury, based on the following facts: (1) After Korum withdrew his guilty plea and exercised his right to trial, the State retaliated by doubling the number of charges and increasing its sentencing recommendation tenfold, beyond what the circumstances and justice warranted; (2) in so doing, the State distended the already stacked multiple kidnapping charges, one per victim, which should not have been filed under the facts here because they were clearly incidental to the robberies; (3) the State cited no "legitimate, articulable, objective reasons" justifying its actions; and (4) even taking into account that Korum went to trial and his codefendants pleaded guilty, the gross disparity in their charges and sentences is unjustifiable. *Bonisisio*, 92 Wn. App. at 791.

Having found a realistic likelihood of prosecutorial vindictiveness, we do not reach Korum's alternative constitutional challenges—cruel and unusual punishment and violation of the single subject rule. We now turn to the remedy.

## C. Remedy

■ The remedy for prosecutorial vindictiveness is dismissal of charges—original charges and/or those added

---

[40] *See also Miracle*:

[T]he Due Process clause is not offended by all possibilities of increased punishment . . . but only those that pose a realistic likelihood of "vindictiveness." . . . There is, of course, no evidence that the prosecutor in this case acted in bad faith or maliciously in seeking a felony indictment against Perry. The rationale of our judgment . . . , however, [is] not [grounded] upon the proposition that actual retaliatory motivation must inevitably exist. Rather, . . . "since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the [prosecutor]."

592 F.2d at 1273 n.8 (quoting *Blackledge*, 417 U.S. at 27-28).

[41] *Blackledge*, 417 U.S. at 27.

vindictively. *Meyer*, 810 F.2d at 1249. First, we dismiss the kidnapping counts as incidental to the robberies. *See State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980).

Second, as to the new charges that the State threatened and added after Korum exercised his right to trial, we dismiss them too because it is "reasonably likely" that they were the product of prosecutorial vindictiveness and created a reasonable apprehension of retaliation in Korum, thereby violating his right to due process of law, specifically his right to trial by jury. *Blackledge v. Perry*, 417 U.S. 21, 27, 94 S. Ct. 2098, 40 L. Ed. 2d 628 (1974); *Miracle v. Estelle*, 592 F.2d 1269 (5th Cir. 1979).

▮ Third, as to the remaining counts, we remand to the trial court to determine which counts should be dismissed in order to provide a deterrent to prosecutorial vindictiveness.[42] CrR 8.3(b) gives the trial court power to dismiss charges on equitable grounds and "protect[s] against arbitrary action or governmental misconduct." *State v. Starrish*, 86 Wn.2d 200, 205, 544 P.2d 1 (1975). Governmental misconduct or arbitrary action by the prosecutor warrants dismissal of charges under CrR 8.3(b).[43] *Starrish*, 86 Wn.2d at 206.

Therefore, we dismiss Counts 2, 3, 8-12, 18, 19, and 25 (all kidnapping counts) and Counts 17, 20-22, 24, and 26-32 (new counts added after Korum's plea withdrawal and jury

---

[42] *Meyer*, 810 F.2d at 1249:

If in cases of vindictive prosecution the trial court judge may only dismiss the additional charge, the prosecutor will have nothing to lose by acting vindictively. The government's position, if accepted, would remove the deterrent effect of the doctrine of prosecutorial vindictiveness—a doctrine which the Supreme Court *designed* to be largely prophylactic in nature.

[43] For example, dismissal of charges for governmental misconduct occurred in the following cases: *State v. Sonneland*, 80 Wn.2d 343, 494 P.2d 469 (1972) (an amended information charging defendant with a felony after the prosecutor had agreed to charge him with a lesser crime in exchange for information constituted arbitrary action and was properly dismissed); *State v. Cory*, 62 Wn.2d 371, 382 P.2d 1019 (1963) (information dismissed after the court found that eavesdropping on an attorney-client conference violated the right to counsel).

trial). We remand to the trial court (1) to determine additional appropriate remedies to mitigate prosecutorial vindictiveness, including dismissal of any remaining counts, and (2) to resentence Korum such that his sentence is roughly proportionate to his participation in the home invasions and to his coconspirators' sentences, taking into account their levels of involvement.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

MORGAN and ARMSTRONG, JJ., concur.

Review granted at 152 Wn.2d 1021 (2004).