[Nos. 39103-1-II; 40153-3-II; Division Two. November 7, 2012.]
39113-9-II.

THE STATE OF WASHINGTON, *Respondent*, v. JAMES LEROY
LINDSAY, SR., *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. JENNIFER SARAH
HOLMES, *Appellant*.

812

*Thomas M. Kummerow* (of *Washington Appellate Project*), for appellant Lindsay.

*Barbara L. Corey*, for appellant Holmes.

*Mark E. Lindquist, Prosecuting Attorney*, and *Kimberley A. DeMarco, Deputy*, for respondent.

¶1 JOHANSON, A.C.J. — Jennifer Sarah Holmes appeals her jury convictions for first degree burglary, first degree robbery, unlawful imprisonment, second degree assault, and theft of a firearm. James Leroy Lindsay Sr. appeals his jury convictions for first degree burglary, first degree robbery, second degree kidnapping, second degree assault, and theft of a firearm. Among other arguments, in the published

portion of this opinion, Lindsay and Holmes argue that the prosecutor engaged in multiple acts of misconduct requiring reversal of their convictions and that the trial court violated constitutional protections against double jeopardy.

¶2 In the unpublished portion of this opinion, Holmes and Lindsay argue that the trial court violated their public and open trial right. Additionally, Lindsay argues that the jail guard's disposal of Lindsay's notebook violated his right to counsel. Holmes argues that (1) the trial court abused its discretion by failing to admit evidence of the alleged victim's cocaine addiction, (2) her restitution hearing lacked due process, and (3) several errors combine to create cumulative error.

¶3 In the published portion of this opinion, we hold that although the prosecutor committed misconduct, the misconduct did not substantially affect the jury's verdict. We further hold that both Lindsay's conviction for second degree assault and his conviction for second degree kidnapping merge with his first degree robbery conviction. Additionally, we hold that Holmes's conviction for second degree assault merges with her first degree robbery conviction. Finally, in the unpublished portion of this opinion, we address and reject Holmes's and Lindsay's remaining issues. Thus, we affirm both Lindsay's and Holmes's convictions and remand for resentencing on the merged convictions.

## FACTS

### I. Substantive Facts and Procedure

¶4 Jennifer Holmes and Lawrence Wilkey began their seven-year romantic relationship in 1998. In 2004, after living in Washington State, the couple moved to Idaho. Thereafter, Holmes met James Lindsay, decided to marry him, and told Wilkey that she no longer loved him. Three weeks later, when Holmes and Lindsay were away on a day

trip, Wilkey moved out, taking many property items[1] with him to Washington.

¶5 When Holmes returned home, she called the sheriff's office and reported that a theft had occurred. The deputies concluded that Holmes's property loss was a civil matter and advised her to consult with a civil attorney.

¶6 Months later, Holmes and Lindsay drove from Idaho to Wilkey's home in Pierce County. According to Wilkey, Lindsay "burst open" Wilkey's door and entered with a pipe in his raised hand. 25 Verbatim Report of Proceedings (VRP) at 1901. After Lindsay and Holmes violently invaded his home, they bound him with "zip ties" and a leash, beat and choked him with a pipe, rendered him unconscious, taunted him, and took his property.

¶7 In contrast, Lindsay told the police[2] that Wilkey opened the front door and then ran toward the back door saying something about a gun. Lindsay claimed that he was worried Wilkey was about to arm himself, so he ran into the house and the two men wrestled. Lindsay admitted that he used zip ties to restrain Wilkey so he would not interfere as Lindsay and Holmes collected their belongings. According to Holmes, Wilkey seemed happy, albeit surprised, to see her and, although he did not protest to her entering his home, she remembered a scuffle between the two men. Holmes further claimed that she never saw Wilkey restrained in any way and that Wilkey never objected to her taking her property.

¶8 After Lindsay and Holmes left his home, Wilkey eventually freed himself and went to his neighbor's house, and his neighbor called the police. The responding paramedic unit found Wilkey upset, with scratches and bruises on both legs and zip ties around his wrists and ankles, and they took him to the hospital. The attending doctor treated Wilkey for abrasions on his extremities, a contusion on his

---

[1] Throughout the trial, the parties contested who rightfully owned the property.

[2] Lindsay gave a statement to police. He did not testify at trial.

head, and issues relating to diabetes. But the doctor did not find bruises on Wilkey's torso consistent with being beaten with a pipe. Nor did Wilkey's CT (computed tomography) scan, x-rays, or urine tests reveal other assault injuries.

¶9 Based on the March 2006 events, the State charged Holmes and Lindsay with one count each of first degree burglary,[3] first degree robbery,[4] first degree kidnapping,[5] first degree assault,[6] and four counts each of theft of a firearm.[7] The jury found Holmes guilty of first degree burglary, first degree robbery, unlawful imprisonment, second degree assault, and one count of theft of a firearm. The jury found Lindsay guilty of first degree burglary, first degree robbery, the lesser-included charges of second degree kidnapping, second degree assault, and one count of theft of a firearm. By special verdict, the jury found that neither Holmes nor Lindsay was armed with a firearm during the commission of the crimes. Also, by special verdict, the jury found that Lindsay and Holmes committed the lesser-included charge of second degree assault on the basis of an "assault committed with the intent to commit a felony." Clerk's Papers (Lindsay) (CPL) at 394; Clerk's Papers (Holmes) at 732.

¶10 The trial court sentenced Holmes on each count, to be served concurrently for a total of 89.5 months.[8] The trial court sentenced Lindsay on each count, to be served con-

---

[3] RCW 9A.52.020(1)(a), (b).

[4] Former RCW 9A.56.190 (1975); RCW 9A.56.200(1)(a)(ii).

[5] Former RCW 9A.40.020(1)(c) (1975).

[6] RCW 9A.36.011(1)(a).

[7] RCW 9A.56.020, .300(1)(a).

[8] The trial court sentenced Holmes to 66 months for first degree burglary, 89.5 months for first degree robbery, 14 months for unlawful imprisonment, 38 months for second degree assault, and 36 months for firearm theft.

currently for a total of 102 months.[9] The trial court ordered both defendants to pay restitution. Holmes and Lindsay appeal.

## II. Objectionable Conduct

### A. Trial Conduct

¶11 Holmes and Lindsay's joint trial occurred over more than a year and produced 98 volumes reporting the proceedings. Holmes and Lindsay had separate counsel. The record reveals objectionable conduct by the prosecutor and Holmes's counsel throughout the trial, much of which occurred outside the jury's presence.[10] The following are descriptions of conduct that occurred in the jury's presence.

¶12 At one point, Holmes's counsel objected to the prosecutor's examination of Wilkey, saying, "Oh, your Honor, let's lead a little bit more." 24 VRP at 1852. The prosecutor objected and asked for a sidebar, and Holmes's counsel said, "I would like it on the record outside the presence of the jury if counsel is going to be personally attacking me for my meritorious objections." 24 VRP at 1853.

¶13 Several days later, Holmes's counsel objected to the prosecutor's questions as eliciting hearsay, and the prosecutor replied that he asked the question to put the defendant's statement into context. Holmes's counsel replied that she did not know the "context exception" and that perhaps the prosecutor could point it out for her. 40 VRP at 3222. The prosecutor asked that parties make objections to the court instead of insulting fellow counsel. Holmes's counsel re-

---

[9] The trial court sentenced Lindsay to 78 months for first degree burglary, 102 months for first degree robbery, 60 months for second degree kidnapping, 50 months for second degree assault, 36 months for firearm theft.

[10] Because misconduct or unprofessional behavior occurring outside the jury's presence could not affect the jury's verdict, we do not discuss it extensively here. We note, however, that outside the jury's presence, the prosecutor described Holmes's counsel as having an absolute disregard for the truth, and Holmes's counsel described the prosecutor's conduct as "slimy" and disingenuous.

quested an opportunity to argue outside the jury's presence, and the prosecutor responded, "Maybe counsel should have asked that two minutes ago." Holmes's counsel replied, "[M]aybe [the prosecutor] should keep his mouth shut." 40 VRP at 3223.

¶14 Days later, as Holmes's counsel cross-examined a witness, this exchange occurred:

[THE STATE]: Same objection [calls for speculation].

[HOLMES'S COUNSEL]: He said that he does—

THE COURT: Can I hear the question?

[THE STATE]: She's making argument as we go and she doesn't care if the objection is sustained or not.

[HOLMES'S COUNSEL]: Your Honor, once again we have Mr. Sheeran reporting to read my mind.

47 VRP at 4118.

¶15 During the State's redirect of Wilkey, Holmes's counsel objected to the prosecutor's question, saying that the answer to that question would be new discovery that she had not been "blessed with" before her cross-examination of Wilkey. 51 VRP at 4341. The prosecutor stated, "I can't respond politely," then offered, "I'll ask another question." 51 VRP at 4341-42.

¶16 Later that day, when the prosecutor and Holmes's counsel argued about one of Holmes's objections, the prosecutor said, "We're going to have like a sixth grader [argument]—" 51 VRP at 4357. At that point, the trial court excused the jury.

¶17 The next day, although the trial court had previously determined that the defendants could elicit testimony regarding Wilkey's alleged drug use only for relevant time periods,[11] Holmes's counsel asked the witness whether 13 years ago, Wilkey's father had kicked Wilkey out of the house for drug use. Becoming upset, the prosecutor said:

---

[11] The relevant time periods included the time of the Wilkey and Holmes's break-up, the time of the division of property, and the time of the allegations.

[THE STATE]: Objection, Your Honor, and motion outside the presence.

And counsel walked right into this after freaking six weeks—

THE COURT: Hold on just a minute.

[HOLMES'S COUNSEL]: Mr. Sheeran is having a tantrum.

THE COURT: If I could have the jury go into the jury room.

[THE STATE]: Tantrum, because you—

52 VRP at 4554. After the jury left, the parties continued to argue.

¶18 Several days later, as Holmes's counsel cross-examined a witness, the prosecutor objected, saying, "[I]t seems like impeachment on a collateral matter and we're into silly." 61 VRP at 5423. After the jury was at recess, Holmes's counsel told the trial court that the prosecutor's remark about "silly" denigrated the defense counsel and the prosecutor should know better. 61 VRP at 5428.

¶19 While Holmes testified on her own behalf that during their relationship, Wilkey hurt her physically and emotionally, she added that while she was testifying, the prosecutor was laughing and that his behavior upset her. During cross-examination, the State asked Holmes if she remembered whether Wilkey ever owned guns during their relationship. Holmes responded, "That's a complicated question," and the State replied, "Not really." 87 VRP at 8092. Holmes's counsel objected, noting that "she thinks that there are some—" 87 VRP at 8092. The prosecutor said, "Yeah, we all know that." 87 VRP at 8092. Holmes's counsel told the prosecutor, "Counsel, I think your rudeness has reached a new low." 87 VRP at 8092. After the jury recessed, the parties continued to argue.

## B. Closing Argument

¶20 The prosecutor began closing argument with Holmes's counsel frequently objecting on grounds of misstatement or mischaracterization of the evidence. The trial court repeat-

edly responded, "[T]he jury will decide all issues of fact in this case." 95 VRP at 8693; *see also* 95 VRP at 695.

¶21 The prosecutor then reviewed Holmes's testimony, characterizing parts of it as "the most ridiculous thing I've ever heard." 95 VRP at 8708. He told the jury:

> She sat there and told you she wasn't mad at [Wilkey] when he took the stuff; she wasn't mad that he took the kids' computer; she wasn't mad that he took the blender; she wasn't mad that he took the food; she wasn't mad that he took the entertainment center; she wasn't mad that he took the bed; she wasn't mad when the police told her it was a civil action and she should go hire an attorney; she wasn't mad when the insurance company wasn't paying out; she wasn't mad after six-plus hours of driving over here on her horribly bad back that had to be in excruciating pain, she still wasn't mad at [him].

95 VRP at 8708. Holmes's counsel objected to the prosecutor's statement as an expression of personal opinion; the trial court overruled her objection.

¶22 Referring to Holmes's testimony that her attorney advised her to repossess her things, the prosecutor commented, "Now that's a little ridiculous." 95 VRP at 8711. The prosecutor characterized Holmes's testimony that Wilkey "was fine" with her taking things and her testimony that she had a good faith claim to the property she took as "funny," "disgusting," and "comical." 95 VRP at 8717, 8722. Holmes's counsel objected repeatedly to his characterizations. The trial court responded that the jury would decide all issues of fact.

¶23 During his rebuttal closing argument, the prosecutor argued that the defense had tried to portray Wilkey as a bully and an abusive thug but that this portrayal did not make sense because Holmes and Lindsay were the aggressors who came into his house and Lindsay admitted that he tied up Wilkey. The prosecutor told the jury that this portrayal of Wilkey "is a crock. . . . What you've been pitched

for the last four hours is a crock." 95 VRP at 8877. There was no objection.

¶24 The prosecutor next referenced several exhibits regarding Holmes's financial documents and told the jury:

> She sat up here day after day after day telling you she always made enough to pay for her bills. Always made enough. She didn't.
>
> That a—you know, this is similar to when she started dating [Lindsay]—that a mother of three is having trouble paying her bills and not making enough to do so is understandable. It is not something that anybody would look down on. Own it. Don't get up here and sit here and lie.

95 VRP at 8882. Holmes did not object to this statement.[12]

¶25 The prosecutor also responded to Lindsay's closing argument, saying:

> You compare what Mr. Wilkey said with all the evidence when you're looking at his credibility, and then you compare what Jennifer Holmes said to you for two months.

95 VRP at 8884. Holmes's counsel immediately moved for a mistrial, arguing that the State was improperly asking the jury to consider Lindsay's statement against Holmes. The trial court stated it would consider the matter outside the jury's presence after all of the closing argument.

¶26 The prosecutor continued his rebuttal:

> [THE STATE]: Ten months. Do they get . . . (sotto voce)
>
> [HOLMES'S COUNSEL]: I can't hear you.
>
> [THE STATE]: Do they?
>
> [HOLMES'S COUNSEL]: Your Honor, I can't hear him. My clients have a right to hear what's going on at their—at her trial. Possibly Mr. Sheeran could raise his voice.
>
> THE COURT: Keep your voice up, please, so everybody can hear.

---

[12] Holmes did object shortly thereafter, but her objection appears to be connected to the statement the prosecutor made after this statement, regarding evidence of guns in the house.

[THE STATE]: Thank you.

[HOLMES'S COUNSEL]: Could the court reporter read back the last couple of comments?

[LINDSAY'S COUNSEL]: Did the court reporter hear it?

COURT REPORTER: I said I couldn't hear it.

[HOLMES'S COUNSEL]: Oh, then it's not in the record.

[THE STATE]: Do these two get to get away with it? It's a simple question.

95 VRP at 8884-85 (second alteration in original).

¶27 Later, the prosecutor said, "I mean, the Jennifer Holmes story is arguably—well, it's silly . . . (sotto voce)." 95 VRP at 8886 (alteration in original). Holmes's counsel immediately stated she could not hear him. The prosecutor responded, "Maybe if counsel and her client could just be quiet for a few minutes they might be able to hear something." 95 VRP at 8887. Holmes's counsel objected, arguing that the prosecutor must not behave so rudely. Both the court reporter and Lindsay affirmed that they had not heard the prosecutor. The prosecutor said:

I'll try to do my best, Your Honor. Thank you.

What I was saying was—

. . . .

—Ms. Holmes['s] story about what happened afterward is as silly as her claim that she wasn't mad.

95 VRP at 8887.

¶28 After a short while, the prosecutor continued addressing the jury:

[THE STATE]: So everything that happened happened in what, 90 seconds? Called Richard Vazquez, had him come running over, zip tie, beat him up, go to the cops? Yeah. Ask yourself who wants to find the truth and . . . (sotto voce).

[COURT REPORTER]: Ask yourself . . . ?

[THE STATE]: Who wants to find the truth. Ask yourself what the truth is. Convict them.

95 VRP at 8888 (alterations in original). Outside the jury's presence, the trial court ruled that the jurors had been instructed how to handle the charges with respect to each defendant who was joined for trial, and it denied Holmes's mistrial motion.

## ANALYSIS

### I. PROSECUTORIAL MISCONDUCT

¶29 Holmes and Lindsay argue that we must reverse their convictions because of extensive prosecutorial misconduct throughout the trial.[13] Specifically, they argue that the prosecutor committed misconduct by denigrating Holmes's counsel numerous times; misstating and trivializing the burden of proof; expressing personal opinion about the credibility of the State's witness and the defendant; telling the jury it is to consider all the evidence, without clarifying that Lindsay's police statement must not be considered against Holmes; and speaking to the jury in a whisper. The State responds that Holmes and Lindsay do not meet their burden to show that the prosecutor's conduct caused prejudice. Although we strongly disapprove of both the prosecutor's and Holmes's counsel's repeated unprofessional conduct, we do not conclude that the prosecutor's misconduct prejudiced the jury.

### A. Standard of Review

¶30 Holmes and Lindsay bear the burden of showing that (1) the State committed misconduct and (2) the misconduct had prejudicial effect. *State v. Anderson*, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010). If a defendant establishes that the State made improper statements, then we review whether those improper statements prejudiced the defendant under

---

[13] Lindsay makes this same argument in his statement of additional grounds for review; we consider it here. RAP 10.10(a).

one of two different standards of review. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

¶31 If the defendant preserved the issue by objecting at trial, we evaluate whether there was a substantial likelihood that the improper comments prejudiced the defendant by affecting the jury. *Emery*, 174 Wn.2d at 760; *Anderson*, 153 Wn. App. at 427. But if the defendant failed to object to the improper argument at trial, defendant must show that the State's misconduct "was so flagrant and ill intentioned that an instruction would not have cured the [resulting] prejudice." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (citing *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011)). This more stringent second standard of review requires the defendant to show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *Thorgerson*, 172 Wn.2d at 455). But we judge misconduct by the effect likely to flow from it and focus more on whether an instruction could have cured the State's misconduct. *Emery*, 174 Wn.2d at 762. We inquire whether the misconduct has engendered "'a feeling of prejudice'" that would prevent a defendant's fair trial. *Emery*, 174 Wn.2d at 762 (quoting *Slattery v. City of Seattle*, 169 Wash. 144, 148, 13 P.2d 464 (1932)).

## B. The Unique Role of a Prosecutor

¶32 As a state agent, the prosecuting attorney represents the people and presumptively acts with impartiality in the interest of justice. *State v. Fisher*, 165 Wn.2d 727, 746, 202 P.3d 937 (2009). Prosecutors are quasi-judicial officers tasked with prosecuting those who violate the peace and dignity of the state and tasked with searching for justice. *State v. Case*, 49 Wn.2d 66, 70, 298 P.2d 500 (1956) (quoting *People v. Fielding*, 158 N.Y. 542, 547, 53 N.E. 497

(1899)). Our Supreme Court has pronounced that although prosecutors must deal with all that is coarse and brutal in human life,

> "the safeguards which the wisdom of ages has thrown around persons accused of crime cannot be disregarded, and such officers are reminded that a fearless, impartial discharge of public duty, accompanied by a spirit of fairness toward the accused, is the highest commendation they can hope for. Their devotion to duty is not measured, like the prowess of the savage, by the number of their victims."

*State v. Warren*, 165 Wn.2d 17, 27-28, 195 P.3d 940 (2008) (emphasis omitted) (internal quotation marks omitted) (quoting *State v. Charlton*, 90 Wn.2d 657, 665, 585 P.2d 142 (1978)), *cert. denied*, 556 U.S. 1192 (2009). Recently, our Supreme Court reiterated that prosecutors have a duty of fairness to the defendant:

> Defendants are among the people the prosecutor represents. The prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated. Thus, a prosecutor must function within boundaries while zealously seeking justice.

*State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011) (citations omitted).

## C. Impugning Defense Counsel

¶33 Holmes and Lindsay argue that the prosecutor committed misconduct by denigrating Holmes's counsel numerous times and that this misconduct easily satisfies any definition of "the most intolerable government conduct." Br. of Appellant (Holmes) at 41. The State responds that both the prosecutor and Holmes's counsel engaged in unprofessional conduct, which, although regrettable, does not constitute prosecutorial misconduct. We agree that both the prosecutor and Holmes's counsel acted unprofessionally; however, we conclude that denigrating counsel is prosecutorial misconduct.

¶34 Although a prosecutor may comment on the evidence before the jury, a prosecutor's comments demeaning defense counsel's integrity are improper. *Thorgerson*, 172 Wn.2d at 451. Prosecutorial expressions maligning defense counsel "severely damage an accused's opportunity to present his case before the jury." *Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983), *cert. denied*, 469 U.S. 920 (1984). Therefore, such expressions constitute "an impermissible strike at the very fundamental due process protections that the Fourteenth Amendment has made applicable to ensure an inherent fairness in our adversarial system of criminal justice." *Bruno*, 721 F.2d at 1195. We view any abridgment of this principle's sanctity as "particularly unacceptable." *Bruno*, 721 F.2d at 1195.

¶35 In *Thorgerson*, our Supreme Court held that the prosecutor "went beyond the bounds of acceptable behavior" and committed misconduct by calling defense arguments " 'bogus,' " and " 'sleight of hand.' " *Thorgerson*, 172 Wn.2d at 451-52. Here, the prosecutor and Holmes's counsel displayed mutual animosity and frequently argued over legal objections. For example, referring to Holmes's counsel, the prosecutor said, "[S]he doesn't care if the objection is sustained or not," "We're going to have like a sixth grader [argument]," and "[W]e're into silly." 47 VRP at 4118; 51 VRP at 4357; 61 VRP at 5423. Another time, Holmes's counsel was in the middle of an objection and the prosecutor interrupted her, saying, "Yeah, we all know that." 87 VRP at 8092. Yet another time, the prosecutor responded to Holmes's counsel's objection by stating, "Maybe if counsel and her client could just be quiet for a few minutes they might be able to hear something." 95 VRP at 8887. At one point, the prosecutor became visibly upset and Holmes's counsel said the prosecutor is having "a tantrum." 52 VRP at 4554. The prosecutor replied, "And counsel walked right into this after freaking six weeks" and said directly to Holmes's counsel, "Tantrum, because you—." 52 VRP at 4554.

¶36 Over and over again, courts have reminded prosecu-
tors that they are something more than mere advocates or
partisans and that they represent the people and act in the
interest of justice. *Fisher*, 165 Wn.2d at 746. In a similar[14]
New York case, the prosecutor referred to defense counsel
with words such as " 'puke' " and " 'stinks' " and accused
defense counsel of untruth, befuddlement, entrapment, and
trickery. *People v Steinhardt*, 9 N.Y.2d 267, 173 N.E.2d 871,
873, 213 N.Y.S.2d 434 (1961). We agree with the *Steinhardt*
court that a decent respect for the defendants' rights, for the
trial courts, and for the law itself requires that we declare
this degree of quarreling and bandying of insults between
counsel misconduct. *Steinhardt*, 173 N.E.2d at 873-74.

### D. Misstating Burden of Proof

¶37 Holmes and Lindsay also argue that the
prosecutor misstated and trivialized the State's burden of
proof. Among their arguments, Holmes and Lindsay argue
that the prosecutor misstated the burden of proof by com-
paring it to everyday decision making and by telling the
jury it needed to find "the truth." Br. of Appellant (Holmes)
at 47. We agree that in some matters, the prosecutor
misstated and trivialized its burden.

### 1. Everyday decisions

¶38 When a prosecutor compares the reasonable doubt
standard to everyday decision making, it improperly mini-
mizes and trivializes the gravity of the standard and the
jury's role. *Anderson*, 153 Wn. App. at 431; *see also State v.
Walker*, 164 Wn. App. 724, 732, 265 P.3d 191 (2011), *petition
for review filed*, No. 86790-9 (Wash. Dec. 8, 2011); *State v.
Johnson*, 158 Wn. App. 677, 684, 243 P.3d 936 (2010), *review
denied*, 171 Wn.2d 1013 (2011). We note that we came to a

---

[14] We note that the *Steinhardt* court does not specify that the jury was present
during the outbursts. But we assume from the context that insults between
counsel occurred in the jury's presence. *See Steinhardt*, 173 N.E.2d at 872.

different conclusion distinguishing *Curtiss* from *Anderson* by stating, "Here, the State's comments about *identifying* the puzzle with certainty before it is complete are not analogous to the weighing of competing interests inherent in a *choice* that individuals make in their everyday lives." *State v. Curtiss*, 161 Wn. App. 673, 700-01, 250 P.3d 496, *review denied*, 172 Wn.2d 1012 (2011).

¶39 Here, the prosecutor used a puzzle analogy to describe the experience of a person who begins a puzzle not knowing what picture it will make but who eventually knows beyond a reasonable doubt that the picture is of Seattle. The prosecutor described for the jury: "[Y]ou put in about 10 more pieces and see this picture . . . you can be halfway done with that puzzle . . . . You could have 50 percent of those puzzle pieces missing and you know it's Seattle." 95 VRP at 8727. Additionally, the prosecutor compared "beyond a reasonable doubt" to the confidence a person feels walking with the "walk sign" at a crosswalk at a busy street without being run over by a car. 95 VRP at 8728. The prosecutor told the jury that although it is possible that the car will not stop, "it's not reasonable. We don't live our life in fear." 95 VRP at 8729. The prosecutor told the jury that reasonable doubt "is not an impossible standard" but "a standard you probably use . . . pretty much every day." 95 VRP at 8728. Because these explanations involve comparisons to "everyday decision making," they are improper. *Anderson*, 153 Wn. App. at 431. Further, these analogies quantified the number of puzzle pieces (and the percentage of missing pieces) with a degree of certainty purporting to be equivalent to the beyond-a-reasonable-doubt standard. *See Anderson*, 153 Wn. App. at 432. We conclude that the prosecutor's analogies minimized and trivialized the gravity of the standard and the jury's role.

## 2. Declare the truth statement

¶40 Holmes and Lindsay also argue that the prosecutor misstated the burden of proof by telling the jury it needed to find "the truth." Br. of Appellant (Holmes) at 47.

¶41 The jury's duty is to determine whether the State has met its burden, not to solve a case. *Anderson*, 153 Wn. App. at 429. We have distinguished the prosecutor's statement to " 'return a verdict that you know speaks the truth' " from the prosecutor's statements to " 'declare the truth' " and " 'decide the truth of what happened.' " *Walker*, 164 Wn. App. at 733 (holding that the latter two are improper) (internal quotation marks omitted) (quoting *Curtiss*, 161 Wn. App. at 701).

¶42 Here, the prosecutor asked the jury "to do what you swore to do: Render verdicts." He argued that "verdict" is a Latin word meaning "to speak the truth" and "voir dire" is French for "speak the truth." 95 VRP at 8730. The prosecutor explained to the jury that they started trial with "voir dire," and now the jury would end the trial with "verdictum" or verdict. 95 VRP at 8730. The prosecutor urged the jury "to do what you know is true: Speak the truth. Convict both of these defendants." 95 VRP at 8730. Finally, the prosecutor argued, "Ask yourself who wants to find the truth . . . . Ask yourself what the truth is. Convict them." 95 VRP at 8888. Although these statements reminded the jury to do "what you *know* is true," they also instructed the jury to "find the truth" and to "[s]peak the truth," thereby finishing the trial. As we held in *Anderson*, this was improper. *Anderson*, 153 Wn. App. at 429.

### 3. To "own" her behavior statement

¶43 Holmes also argues that the prosecutor misstated the burden of proof by telling the jury that Holmes needed "to 'own' " her behavior. Br. of Appellant (Holmes) at 48, 50 (quoting 95 VRP at 8715, 8883). Holmes relies on *State v. Fleming*, 83 Wn. App. 209, 213, 921 P.2d 1076 (1996), *review denied*, 131 Wn.2d 1018 (1997). In *Fleming*, Division One of this court held that it was misconduct for the prosecutor to argue that in order to acquit a defendant, the jury had to find that the State's witnesses are either lying or mistaken. *Fleming*, 83 Wn. App. at 213.

¶44 Here, the prosecutor did not suggest that to acquit Holmes, the jury must conclude that Wilkey was lying. Instead, the prosecutor told the jury:

> You know what, if you had a romantic relationship with somebody while you're living with somebody, it may not be ideal. It's not criminal. But own something. When you come into a courtroom and swear under oath that you're going to tell the truth, own something.

95 VRP at 8714-15. Here, the prosecutor argued that because Holmes was not forthright in her testimony about the timing of her relationship with Lindsay, the jury should question her general credibility. Because the prosecutor based this argument on reasonable inferences from the evidence, it was not improper. *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010).

### E. Personal Opinion of Credibility or Guilt

¶45 Next, Holmes and Lindsay argue that the prosecutor committed misconduct by repeatedly expressing his personal opinion about the credibility of witnesses and the accused's guilt. The State responds that the prosecutor properly based his closing arguments about Holmes's credibility on evidence presented at trial. We reject Holmes and Lindsay's argument relating to Wilkey's credibility, but we conclude that the prosecutor improperly asserted his opinion about Holmes's credibility.[15]

¶46 The State may not assert its personal opinion as to the defendant's guilt or a witness's credibility. *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006); *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984). But

---

[15] Relying on the same facts, Holmes also argues that the prosecutor impermissibly argued "prior bad acts" that the court had not admitted into evidence. Br. of Appellant (Holmes) at 51. Although we conclude that the prosecutor improperly expressed his personal opinion, in part because he stated, "Don't get up here and sit here and lie," the record shows that the prosecutor did not discuss prior bad acts, and we reject that argument. 95 VRP at 8882.

a prosecutor enjoys wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence. *Lewis*, 156 Wn. App. at 240. " '[T]here is a distinction between *the individual opinion of the prosecuting attorney, as an independent fact,* and *an opinion based upon or deduced from the testimony in the case.*' " *McKenzie*, 157 Wn.2d at 53 (quoting *State v. Armstrong*, 37 Wash. 51, 54-55, 79 P. 490 (1905)). To determine whether the prosecutor is expressing a personal opinion of the defendant's guilt, independent of the evidence, we view the challenged comments in context and look for " '*clear and unmistakable*' " expressions of personal opinion. *McKenzie*, 157 Wn.2d at 53-54 (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)).

¶47 For example, in *Anderson*, we held that the prosecutor did not express a personal opinion when, without objection, he characterized the defendant's testimony as " 'made up on the fly,' " " 'ridiculous,' " and " 'utterly and completely preposterous.' " *Anderson*, 153 Wn. App. at 430. In contrast, in *Reed*, our Supreme Court held that the prosecutor clearly asserted his improper personal opinion when he called the defendant witness a liar at least four separate times, stated that Reed "did not have a case," asserted that Reed was clearly a " 'murder two,' " and implied that the jury should not believe defense counsel because they drove from out of town in fancy cars. *Reed*, 102 Wn.2d at 146.

### 1. Statements about Holmes's credibility

¶48 Here, during closing argument, the prosecutor reviewed Holmes's testimony, characterizing various parts of it as "funny," "disgusting," "comical," and "the most ridiculous thing I've ever heard." 95 VRP at 8708, 8717, 8722. Taken in isolation, these comments are similar to the comments in *Anderson*, 153 Wn. App. at 430. But addition-

ally, the prosecutor told the jury that Holmes should not "get up here and sit here and lie." 95 VRP at 8882. Further, we note with dismay that the prosecutor told the jury that Holmes and Lindsay's portrayal of Wilkey as a bully "is a crock. . . . What you've been pitched for the last four hours is a crock." 95 VRP at 8877. As in *Reed*, "[t]hese statements suggest not the dispassionate proceedings of an American jury trial," and such language " 'cannot with propriety be used by a public prosecutor,' " who is presumed to act impartially in the interests of justice. *Reed*, 102 Wn.2d at 146, 146-47 (internal quotation marks omitted) (quoting *State v. Case*, 49 Wn.2d 66, 70-71, 298 P.2d 500 (1956)).

¶49 We note that the prosecutor did not merely argue that Holmes's and Lindsay's versions of events seemed unreasonable, illogical, or unlikely. We do not suggest that a prosecutor does not have "wide latitude" in closing argument to draw reasonable inferences regarding the witness's credibility from the evidence. *Lewis*, 156 Wn. App. at 240. Rather, we conclude that a prosecutor need not use language such as, "What you've been pitched for the last four hours is a crock" to express an inference from the evidence. 95 VRP at 8877. We conclude that such language is a " '*clear and unmistakable*' " expression of impermissible personal opinion. *McKenzie*, 157 Wn.2d at 54 (quoting *Papadopoulos*, 34 Wn. App. at 400). Finally, here the prosecutor laughed while Holmes testified on the stand that Wilkey was abusive. The State does not rebut or explain this circumstance; we conclude it was improper conduct.

## 2. Statement about Wilkey

¶50 During a colloquy with the trial court, the prosecutor said, "The witness is under cross-examination in a criminal case[ ] doing the best he can to answer the questions one after another for the better part now of the whole day." 33 VRP at 2461. Examined in context, the prosecutor's statement did not refer to Wilkey's credibility

or veracity; rather, the statement referred to Wilkey's cooperativeness responding to Holmes's counsel. Specifically, the prosecutor made the comment while arguing to the trial court that Wilkey had not waived attorney-client privilege, despite responding to Holmes's counsel's surprise question, "Have you told that to your lawyer?" 33 VRP at 2460. We conclude that the prosecutor did not make an improper statement about Wilkey's credibility.

### F. Asking the Jury To Consider All the Evidence

¶51 Holmes also argues that the prosecutor committed misconduct by informing the jury that the nontestifying codefendant's confession could be used as evidence against Holmes. Br. of Appellant (Holmes) at 50. We conclude that the prosecutor did not make an improper statement.

¶52 Under the Sixth Amendment's confrontation clause, an accused has a right to confront witnesses against him. U.S. CONST. amend. VI; *see also Crawford v. Washington*, 541 U.S. 36, 42, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Unless the witness is unavailable to testify and the defendant has had a prior opportunity to cross-examine the witness, the confrontation clause prohibits admission of the witness's "[t]estimonial" statements when that witness does not take the stand at trial. *Crawford*, 541 U.S. at 59. Such was not the case here.

¶53 During rebuttal closing argument, the prosecutor told the jury:

> You compare what Mr. Wilkey said with all the evidence when you're looking at his credibility, and then you compare what Jennifer Holmes said to you for two months.

95 VRP at 8884. Holmes's counsel immediately objected, arguing that contrary to the jury instructions, the prosecutor had asked the jury to consider Lindsay's statement against Holmes. On appeal, Holmes supplies no authority, other than the general rule from *Crawford*, to argue that the prosecutor's statement was improper.

¶54 Here, the prosecutor's statement properly, highlighted the jury's role to weigh Wilkey's testimony against all the evidence, including Holmes's testimony and Lindsay's police statement. Although the statement did not clarify that the jury must not consider Lindsay's testimony against Holmes, we conclude that it was not by itself improper. Further, to the extent that it may have confused the jury, the trial court properly instructed the jury not to consider Lindsay's incriminating statement against Holmes and further instructed the jury to decide the charges against each defendant separately.

## G. Inaudible Speech

¶55 Holmes and Lindsay further argue that during closing argument, the prosecutor purposefully whispered so that only the jury could hear him, thereby denying their right to appeal by denying them a complete record for review.[16] The State does not respond to this argument.[17]

¶56 A criminal defendant is constitutionally entitled to a " 'record of sufficient completeness' " to permit effective appellate review of his or her claims. *State v. Thomas*, 70 Wn. App. 296, 298, 852 P.2d 1130 (1993) (quoting *Coppedge v. United States*, 369 U.S. 438, 446, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962)).

¶57 Here, while the prosecutor stood right next to the jury, his voice suddenly became inaudible. The trial court ruled that the prosecutor merely needed to repeat himself, which he did. Because of the peculiar circumstances, we are not satisfied with the trial court's reasoning that the prosecutor merely needed to repeat himself; we

---

[16] The dissent notes that the prosecutor's whispers in front of the jury amounts to private communication with the jury. Dissent at 851-52. Because private communication with the jury was not argued to the trial court or briefed on appeal, we decline to address it.

[17] Holmes and Lindsay each make this argument regarding the prosecutor's inaudible voice in their statements of additional grounds; we consider it here.

note that a prosecutor must never whisper to the jury off the record. Nonetheless, we conclude that the record is sufficiently complete overall to allow review of Holmes and Lindsay's claims of prosecutorial misconduct.

## H. Prejudice

¶58 Holmes and Lindsay argue that the prosecutor's misconduct prejudiced their trial; they also argue that the cumulative effect of the misconduct requires reversal. Although we strongly disapprove of the unprofessional behavior as well as the misconduct, we conclude that there was no substantial likelihood that the improper comments affected the jury. Regarding Lindsay, this conclusion is more easily reached because Lindsay admitted to using zip ties to restrain Wilkey so that Wilkey would not interfere as Lindsay and Holmes removed the property from Wilkey's home. Because the jury had Lindsay's admissions as evidence before it, there is only a remote chance, not a substantial likelihood, that the jury's verdict was affected by the prosecutor's misconduct.

¶59 Once the defendant establishes improper prosecutorial conduct, we determine prejudice under one of two standards depending on whether the defendant objected at trial. *Emery*, 174 Wn.2d at 760. Here, Holmes and Lindsay objected to much (but not all) of the misconduct at trial. For example, Holmes did not specifically object when the prosecutor said, "Don't get up here and sit here and lie." 95 VRP at 8882. Nor did Holmes or Lindsay object when the prosecutor asked the jury to find the truth or when the prosecutor said the defense argument was a "crock."[18] Where the defendant failed to object, the defendant waives errors unless he or she establishes that the misconduct was so flagrant and ill intentioned that an instruction would not

---

[18] Neither Holmes nor Lindsay objected to the prosecutor's comparison of the reasonable doubt standard to everyday decision making. But Holmes did criticize the comparison and clarify the actual burden in her closing argument.

have cured the prejudice and the misconduct resulted in prejudice that " 'had a substantial likelihood of affecting the jury verdict.' " *Glasmann*, 175 Wn.2d at 704; *Emery*, 174 Wn.2d at 761 (quoting *Thorgerson*, 172 Wn.2d at 455). Because we concluded that the prosecutor committed misconduct by impugning defense counsel, by misstating and trivializing the burden of proof, and by expressing personal opinion about Holmes's testimony, we look at the effect of each on the jury's verdict.

¶60 Regarding misconduct from misstating the burden of proof and misconduct from expressing personal opinion, we examine the misconduct's affect on the jury in the context of the jury instructions. *Anderson*, 153 Wn. App. at 429. Here, the trial court's instructions to the jury clearly set forth both the jury's actual duties and the State's proper burden of proof. Additionally, we note that all of these improper statements occurred during closing argument. Because the trial court directed the jury to disregard any argument not supported by the law and the trial court's instructions, the prosecutor's closing arguments do not carry the " 'imprimatur of both the government and the judiciary.' " *Emery*, 174 Wn.2d at 759 (quoting Suppl. Br. of Pet'r Olson at 9). As in *Anderson*, we conclude that Holmes and Lindsay do not demonstrate a substantial likelihood that the prosecutor's improper statements affected the verdict. *Anderson*, 153 Wn. App. at 429.

¶61 Regarding the prosecutor's remarks denigrating Holmes's counsel, we note that the majority of remarks and the blatant remarks occurred outside the jury's presence. The State does not deny the number and character of these remarks, but it argues that Holmes's counsel goaded the prosecutor into many of the improper statements and that, in almost every instance, the trial court instructed the jury to disregard the incidents. Although we are dismayed by the repeated rude remarks, we note that a prosecutor's improper remarks are not grounds for reversal " 'if they were invited or provoked by defense counsel and are in

reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective.'" *State v. Weber*, 159 Wn.2d 252, 276-77, 149 P.3d 646 (2006) (quoting *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995)), *cert. denied*, 551 U.S. 1137 (2007).

¶62 Additionally, the trial court stated that it was not clear what effect the prosecutor's emotional outbursts had on the jury. Contrary to Holmes's counsel's argument that the jury would think poorly of her, the trial court opined that the outburst might instead prompt the jury to think poorly of the prosecutor. Nonetheless, out of caution, the trial court issued a curative jury instruction:

> [Y]ou must disregard any conduct by an attorney that you consider unprofessional. You are instructed that you must not hold the conduct of any attorney against their party in this case.

53 VRP at 4605-06. We presume the jury was able to follow the court's instruction. *Warren*, 165 Wn.2d at 28. Therefore, considering only those denigrating remarks made in the jury's presence, we conclude that the trial court properly instructed the jury and that the prosecutor's improper comments did not prejudice the jury.

¶63 Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant her right to a fair trial, even if each error standing alone would be harmless. *Weber*, 159 Wn.2d at 279. But cumulative error does not apply where the errors are few and have little or no effect on the outcome of the trial. *Weber*, 159 Wn.2d at 279. Although there are multiple improper statements in this case, as we discussed above, the misconduct occurred primarily outside the jury's presence and the trial court issued curative instructions for the misconduct in the jury's presence; therefore, the misconduct had little or no effect on the

jury. Holmes and Lindsay do not persuade us that the combined effect of that misconduct denied them a fair trial; thus, their cumulative error claim regarding prosecutorial misconduct fails. *Weber*, 159 Wn.2d at 279.

¶64 The dissent cites to *Glasmann* to support its conclusion that the prosecutor's misconduct here was reversible error. But *Glasmann* is easily distinguished. There, the Supreme Court stated that "[w]hen viewed as a whole, the prosecutor's repeated assertions of the defendant's guilt, improperly modified exhibits, and statement that jurors could acquit Glasmann only if they believed him represent the type of pronounced and persistent misconduct that cumulatively causes prejudice demanding that a defendant be granted a new trial." *Glasmann*, 175 Wn.2d at 710. The facts here simply do not rise to the level of prejudicial misconduct that requires reversal. The prosecutor here did not introduce altered exhibits to the jury; nor did he repeatedly assert his personal belief that the defendants here were guilty. Whether prosecutorial misconduct is so prejudicial that a new trial must be granted is necessarily fact specific, and the facts here do not support the grant of a new trial.

## II. Double Jeopardy

¶65 Next, Lindsay[19] argues that the trial court violated his right to be free from double jeopardy by entering convictions against him for (1) first degree robbery and second degree kidnapping, (2) first degree robbery and second degree assault, and (3) second degree kidnapping and second degree assault. The State responds that Lindsay's convictions for first degree robbery, second degree kidnapping, and second degree assault do not violate double jeopardy protections because each crime is different in law and fact.

---

[19] At the end of this section, we consider Holmes's double jeopardy claims separately.

A. Standard of Review

¶66 We review de novo double jeopardy claims. *State v. Hughes*, 166 Wn.2d 675, 681, 212 P.3d 558 (2009). Article I, section 9 of the Washington Constitution and the Fifth Amendment to the federal constitution protect persons from a second prosecution for the same offense and from multiple punishments for the same offense imposed in the same proceeding. *State v. Turner*, 169 Wn.2d 448, 454, 238 P.3d 461 (2010). Nevertheless, the legislature may constitutionally authorize multiple punishments for a single course of conduct. *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). Where the legislature has provided a statutory scheme distinguishing different degrees of a crime, we may determine that the legislature intended a single punishment for a higher degree of a single crime rather than multiple punishments for several separate, lesser crimes. *State v. Vladovic*, 99 Wn.2d 413, 420, 662 P.2d 853 (1983). Another tool for determining legislative intent is based on the merger doctrine. *State v. Freeman*, 153 Wn.2d 765, 777, 108 P.3d 753 (2005).

¶67 If the evidence proving one crime is also necessary to prove a second crime or a higher degree of the same crime, we consider whether the facts show that the additional crime was committed incidental to the original crime. *State v. Johnson*, 92 Wn.2d 671, 680, 600 P.2d 1249 (1979). If one crime was incidental to the commission of the other, the merger doctrine precludes additional convictions; but if the offenses have independent purposes or effects, the court may impose separate punishment. *Freeman*, 153 Wn.2d at 778; *Vladovic*, 99 Wn.2d at 421. To establish an independent purpose or effect of a particular crime, that crime must injure the person or property of the victim or others in a separate and distinct manner from the crime for which it also serves as an element. *Freeman*, 153 Wn.2d at 779; *Johnson*, 92 Wn.2d at 680.

¶68 Here, the statutes at issue do not expressly permit multiple punishments for the same act and, Lindsay concedes, "[T]he offenses do not have the same elements." Reply Br. of Appellant (Lindsay) at 6. Because evidence proving one conviction was also necessary to prove a second conviction or a higher degree of the same conviction, we consider whether some of Lindsay's convictions should have merged. *Johnson*, 92 Wn.2d at 681.

## B. First Degree Robbery and Second Degree Kidnapping

¶69 Lindsay argues that the trial court's imposition of first degree robbery and second degree kidnapping convictions violated double jeopardy protections because the kidnapping was merely incidental to the robbery. The statutes at issue are RCW 9A.40.030[20] (second degree kidnapping), and RCW 9A.56.200[21] and former RCW 9A.56-.190 (1975)[22] (first degree robbery). The State responds that

---

[20] RCW 9A.40.030 provides:

(1) A person is guilty of kidnapping in the second degree if he or she intentionally abducts another person under circumstances not amounting to kidnapping in the first degree.

(2) In any prosecution for kidnapping in the second degree, it is a defense if established by the defendant by a preponderance of the evidence that (a) the abduction does not include the use of or intent to use or threat to use deadly force, and (b) the actor is a relative of the person abducted, and (c) the actor's sole intent is to assume custody of that person. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, any other crime.

[21] RCW 9A.56.200:

(1) A person is guilty of robbery in the first degree if:

(a) In the commission of a robbery or of immediate flight therefrom, he or she:

(i) Is armed with a deadly weapon; or

(ii) Displays what appears to be a firearm or other deadly weapon.

[22] Former RCW 9A.56.190 provides:

A person commits robbery when he unlawfully takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome

it presented sufficient evidence to prove that Lindsay's second degree kidnapping conviction was distinct from his first degree robbery conviction.

¶70 Here, Lindsay burst through Wilkey's front door with a pipe in his raised hand. Lindsay struck and choked Wilkey with the pipe until Wilkey lost consciousness. Wilkey awoke in the living room area, hog-tied with zip ties, a telephone cord, and a dog leash. While the zip ties, cord, and leash restrained Wilkey, Holmes and Lindsay moved substantial amounts of property from Wilkey's home into their truck. The State argues that the robbery was complete before Lindsay tied up Wilkey; thus, Lindsay's restraint of Wilkey using zip ties was a separate act. Specifically, the State argues that for the purpose of robbery, Lindsay subdued Wilkey by striking him and choking him unconscious; thus, it was only after he was subdued that Lindsay restrained him with zip ties, a telephone cord, and a dog leash. First, *State v. Manchester* directly conflicts with the State's argument that the robbery was complete before Lindsay tied up and restrained Wilkey; thus, we reject that argument. 57 Wn. App. 765, 770, 790 P.2d 217 (1990) (holding that force or fear used to retain property and effectuate escape constitutes robbery).

¶71 Second, we reject the State's argument that Holmes and Lindsay hog-tied Wilkey so that they could humiliate and demean him. The State argues that after Lindsay and Holmes forcibly restrained Wilkey with zip ties, they poured Wilkey's medication down the toilet, hit him, wrapped a robe around his head, and poured alcohol on him. The State's argument is that the restraint had an independent purpose or injury. Although Lindsay and Holmes certainly did demean, humiliate, and assault Wilkey while they restrained him, this does not convince us that the restraint had an independent purpose to humiliate Wilkey. These

resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.

additional assaults may have caused independent injuries for which the State could have charged separately, but the restraint itself did not cause an independent injury. We reject the State's argument that the purpose of the restraint was to allow Lindsay and Holmes to demean, humiliate, and assault Wilkey.

¶72 Furthermore, in *State v. Korum*, we held as a matter of law that kidnapping was incidental to robbery when (1) the restraint was for the sole purpose of facilitating robbery; (2) the restraint was inherent in the robbery; (3) the victims were not transported from their home; (4) the duration of restraint was not substantially longer than necessary to complete the robbery; and (5) the restraint did not create an independent, significant danger. 120 Wn. App. 686, 707, 86 P.3d 166 (2004), *rev'd in part and aff'd in part on other grounds*, 157 Wn.2d 614, 620, 141 P.3d 13 (2006). Reversing the kidnapping convictions, we reasoned, "That all robberies necessarily involve some degree of forcible restraint, however, does not mean that the legislature intended prosecutors to charge every robber with kidnapping." *Korum*, 120 Wn. App. at 705. As our Supreme Court held in *State v. Green*, restraint and movement of a victim that are merely incidental and integral to commission of another crime, such as rape or murder, do not constitute the independent, separate crime of kidnapping. 94 Wn.2d 216, 226-27, 616 P.2d 628 (1980).

¶73 Here, (1) Lindsay and Holmes restrained Wilkey for the purpose of facilitating robbery, (2) the restraint was necessary to allow Lindsay and Holmes to take á substantial amount of property from Wilkey's home and move it into the waiting truck, (3) Lindsay and Holmes did not transport Wilkey from his home, (4) the duration of Wilkey's restraint lasted no longer than necessary for Lindsay and Holmes to complete the robbery and leave, and (5) the restraint did not create significant danger. *Korum*, 120 Wn. App. at 707. We conclude that Wilkey's restraint (charged as kidnapping) was incidental to the crime of first degree

robbery and these convictions merge. *Freeman*, 153 Wn.2d at 778.

## C. First Degree Robbery and Second Degree Assault

 ¶74 Lindsay also argues that the trial court should have merged his conviction for second degree assault with his conviction for first degree robbery because the assault was the sole evidence of the force used to elevate his robbery conviction to first degree robbery.[23] The State responds that Lindsay committed more assaults than the one that elevated his robbery conviction to first degree robbery. We hold that Lindsay's first degree robbery and second degree assault convictions merge.

¶75 The statutes at issue are RCW 9A.56.200[24] and former RCW 9A.56.190[25] (first degree robbery), and former RCW 9A.36.021 (2003)[26] (second degree assault). Considering first degree robbery and second degree assault, our

---

[23] Neither Lindsay nor Holmes challenges the sufficiency of the evidence to support these convictions.

[24] RCW 9A.56.200 provides, in part:

(1) A person is guilty of robbery in the first degree if:
 (a) In the commission of a robbery or of immediate flight therefrom, he or she:
 (i) Is armed with a deadly weapon; or
 (ii) Displays what appears to be a firearm or other deadly weapon.

[25] Former RCW 9A.56.190 provided:

A person commits robbery when he unlawfully takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.

[26] Former RCW 9A.36.021 provided:

(1) A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:
 (a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm; or

Supreme Court concluded, "Generally, . . . these . . . crimes will merge unless they have an independent purpose or effect." *Freeman*, 153 Wn.2d at 780. An exception to the merger doctrine arises when the *"included"* crime has an independent purpose or effect from the other crime. *Freeman*, 153 Wn.2d at 778. One example of an independent effect is when the crime "clearly created separate and distinct injuries." *Vladovic*, 99 Wn.2d at 421. The *Freeman* court noted:

> This exception is less focused on abstract legislative intent and more focused on the facts of the individual case. For example, when the defendant struck a victim *after* completing a robbery, there was a separate injury and intent justifying a separate assault conviction, especially since the assault did not forward the robbery. However, this exception does not apply merely because the defendant used *more* violence than necessary to accomplish the crime. The test is not whether the defendant used the least amount of force to accomplish the crime. The test is whether the unnecessary force had a purpose or effect independent of the crime.

*Freeman*, 153 Wn.2d at 779 (citation omitted).

¶76 We agree with the State that the record supports several assaults against Wilkey, but this argument misses the question entirely. The precise issue here is whether the second degree assault, committed by Lindsay with the intent to commit a felony, had a purpose separate and distinct from his contemporaneous robbery of Wilkey.

¶77 The jury found Lindsay guilty of first degree robbery, but it also found that Lindsay did not commit first degree robbery while armed with a firearm. After finding

---

(b) Intentionally and unlawfully causes substantial bodily harm to an unborn quick child by intentionally and unlawfully inflicting any injury upon the mother of such child; or

(c) Assaults another with a deadly weapon; or

(d) With intent to inflict bodily harm, administers to or causes to be taken by another, poison or any other destructive or noxious substance; or

(e) With intent to commit a felony, assaults another; or

(f) Knowingly inflicts bodily harm which by design causes such pain or agony as to be the equivalent of that produced by torture.

Lindsay guilty of the lesser-included charge of second degree assault (and not first degree assault), the jury found by special verdict that Lindsay committed second degree assault with the intent to commit a felony. The jury specifically rejected that Lindsay committed second degree assault while either armed with a deadly weapon (i.e., the pipe) or by recklessly inflicting substantial bodily injury.

¶78 We do not know, however, to which felony the jury referred when it found Lindsay guilty of assault with the intent to commit a felony. An ambiguity in the jury's verdict under the rule of lenity must be resolved in the defendants' favor.[27] *State v. Kier*, 164 Wn.2d 798, 814, 194 P.3d 212 (2008). Applying the rule of lenity, we conclude that the second degree assault was committed with the intent to commit the felony of robbery. Based on the jury's special verdict finding that Lindsay committed second degree assault with the intent to commit a felony (unidentified), we conclude that under these facts the second degree assault was incidental to the robbery, that there was no distinct and separate purpose other than to commit this felony, and that there was no separate or distinct injury. We therefore conclude that Lindsay's convictions for first degree robbery and second degree assault merge.

D. Second Degree Kidnapping and Second Degree Assault

¶79 Lindsay further argues that the trial court should have merged his second degree assault conviction with his second degree kidnapping conviction because the prosecutor argued at closing that Lindsay restrained Wilkey with zip ties and also argued that Lindsay assaulted Wilkey by the use of zip ties. The State responds that after Lindsay restrained Wilkey with zip ties, he beat him and that this beating was unnecessary for the abduction. Because we

---

[27] To avoid this result, the jury instructions could have specified for the jury which felony the State must prove; alternately, the special verdict form could have instructed the jury to specify which felony Lindsay intended to commit by committing the assault.

find that the second degree assault merges with the first degree robbery,[28] it is unnecessary to address whether the second degree assault merges with the second degree kidnapping and we decline to do so.

¶80 In conclusion, we hold that the second degree kidnapping was incidental to the first degree robbery and therefore, the kidnapping and robbery convictions merge; additionally, the second degree assault was committed with the intent to commit the robbery and therefore, the assault and robbery convictions merge. Accordingly, we remand for resentencing of Lindsay.

### E. Holmes's Double Jeopardy Arguments

¶81 Briefly, we turn to Holmes's double jeopardy argument. Solely by adopting Lindsay's argument, Holmes argues that the trial court violated her constitutional protections against double jeopardy by convicting her for robbery, kidnapping, and assault. She asks us to strike her convictions for unlawful imprisonment and assault and to remand for resentencing. But Lindsay's double jeopardy argument involved his second degree kidnapping conviction, and Holmes was not convicted of second degree kidnapping. Because Holmes did not brief double jeopardy as it pertains to her unlawful imprisonment conviction, we decline to review that argument. RAP 10.3(a)(6).

¶82 Regarding Holmes's request to strike her assault conviction, however, we consider the merits of that request in order to secure a fair and orderly review, despite her cursory double jeopardy argument. RAP 7.3. Based on the jury's special verdict finding that Holmes committed second degree assault with the intent to commit a felony (uniden-

---

[28] The jury found that the second degree assault was committed with intent to commit "a felony." CPL at 394. Because the jury did not specify which felony, it is reasonable to conclude that the second degree assault was committed with the intent to commit the kidnapping. But because we conclude the kidnapping merges with the robbery, in any event, the result remains that both the assault and the kidnapping merge with the robbery.

tified), we conclude that under these facts, her second degree assault was incidental to the robbery, that there was no distinct and separate purpose other than to commit this felony, and that there was no separate or distinct injury. We therefore hold that Holmes's convictions for first degree robbery and second degree assault merge.

¶83 In conclusion, although we do not condone the prosecutor's misconduct, we hold that the misconduct did not substantially affect the jury's verdict. We further hold that Lindsay's second degree assault and second degree kidnapping convictions merge with his first degree robbery conviction and that Holmes's second degree assault conviction merges with her first degree robbery conviction; thus, we remand for resentencing.[29]

¶84 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

HUNT, J., concurs.

¶85 ARMSTRONG, J.[*] (dissenting) — I agree with the majority that the prosecutor engaged in misconduct throughout the trial, culminating in further personal attacks on defense counsel during closing argument, an argument in which the prosecutor also misstated the State's burden of proof; characterized the defense argument as a "crock"; and spoke so softly to the jurors that neither the defense attorneys, the court reporter, nor the trial court could hear what he said. I disagree with the majority that we should conclude that this pervasive and serious misconduct was harmless.

---

[29] In the unpublished portion of this opinion, we address and reject Holmes's and Lindsay's remaining arguments and conclude there was no reversible error.

[*] Judge David H. Armstrong is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

## A. Misconduct outside the Jury's Presence

¶86 The majority assumes that misconduct or unprofessional behavior occurring outside the jury's presence could not affect the jury's verdict. But the misconduct in the jury's presence does not show the extent to which the attorneys' unrelenting misconduct and disrespect for the trial court permeated the trial. Accordingly, I set forth some samples of misconduct committed outside the jury's presence to demonstrate how it infected the whole trial, engendering " 'a feeling of prejudice' " and undermining the sense of fairness. *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012) (quoting *Slattery v. City of Seattle*, 169 Wash. 144, 148, 13 P.2d 464 (1932)).

### 1. Acrimony and Examining Witnesses

¶87 Both Jennifer Holmes's counsel and the prosecutor complained that the other party inappropriately interrupted when they questioned a witness, including questioning occurring in the jury's presence. On one occasion, the prosecutor asked Holmes's counsel not to yell as she questioned a witness; she responded that she "can yell and it's a lot louder" and resumed her questioning. 19 Report of Proceedings (RP) at 1223. On another occasion, when Holmes's counsel questioned a witness, the prosecutor said that Holmes's counsel should ask her questions without badgering or assaulting the witness. Holmes's counsel responded that she did not like "being screamed at and berated" by the prosecutor; she added that the prosecutor was "pissed off." 20 RP at 1338. The prosecutor described Holmes's counsel's witness examination, saying:

> This is silly. You want to ask stupid questions for four flippin' weeks, you're going to get a reaction from me, I'll grant you that. I mean, this is the most ridiculous, pathetic, long-ranging cross-examination of a witness in history.

51 RP at 4307.

### 2. Acrimony and Disrespecting the Trial Court

¶88 The open hostility between the prosecutor and Holmes's counsel displayed disrespect for the trial court and for the law itself. For example, not only did the prosecutor and Holmes's counsel interrupt each other, they interrupted the trial court, at one point causing the trial court to ask, "Can I finish for once?" 42 RP at 3569. Other examples of disrespect to the trial court include the prosecutor telling the trial court that Holmes's counsel's request to interrupt the trial was "a joke" and "ridiculous" and that Holmes's counsel wanted a "Burger King trial . . . [h]ave it my way." 34 RP at 2557. At another point, the prosecutor told the trial court, "I didn't object [earlier] because I was laughing so hard it was so stupid." 53 RP at 4572-73. Later, the prosecutor told Holmes's counsel that she was repeating herself; she replied by telling him to "kindly shut up." 51 RP at 4309. The prosecutor then asked the trial court to instruct Holmes's counsel not to repeat herself; Holmes's counsel replied, "Maybe [the prosecutor] could borrow Your Honor's gown and tell us all how to run this trial." 51 RP at 4309.

¶89 In another instance, Holmes's counsel told the trial court that the prosecutor's comments were "obnoxious." 44 RP at 3831. In response, the prosecutor said, "This is the same garbage that I was talking about days ago when I lost my temper in this courtroom, because it's what she does." 44 RP at 3833.

¶90 After another altercation between the prosecutor and Holmes's counsel, the prosecutor told the trial court:

> If I get one more comment out of counsel that I'm being rude in front of the jury, I'm going to friggin pop a gasket. It's the most—and I know she's smiling, she's laughing, and she's snotty, but it is the most unprofessional, unreasonable thing to do in a courtroom, and she knows it.

87 RP at 8100-01. Holmes's counsel told the trial court that she believed the prosecutor was rude. The prosecutor re-

sponded, "I'm telling the Court right now, I'm going to . . . ." 87 RP at 8101. The trial court asked the prosecutor, "Going to bring your checkbook with you, too?"[30] 87 RP at 8101. The prosecutor told the trial court, "No, I'm going to ask the Court why a checkbook hasn't already been produced because that was exactly what the Court was talking about." 87 RP at 8101. These samples of misconduct, committed outside the jury's presence, demonstrate more than the prosecutor's and Holmes's counsel's treatment of each other; they show an unthinkable disrespect for the trial court and the whole trial process.

### B. Misconduct during Closing Argument

¶91 Finally, the prosecutor capped his performance by whispering to the jury three times during his closing. After the court reporter stated she could not hear the prosecutor, the prosecutor commented only that the problem was defense counsel's for talking to her client. In a posttrial motion for a new trial, the defendants raised the issue and both defense counsel filed supporting declarations. The declarations reported that after the trial court advised the prosecutor to keep his voice up, the prosecutor moved behind counsel's table and shouted his next lines to the jury, which prompted the jurors to laugh. The prosecutor did not contradict this with an affidavit. Instead, he merely argued to the trial court that "it happens" during trials. 97 RP at 8985.

¶92 "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed . . . prejudicial." *Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954). Once private communication with the jury is estab-

---

[30] After considerable unprofessional conduct, the trial court warned the parties if the behavior resumed, it would impose a $1,000 sanction, paid from the offending attorney's personal funds and payable to a charitable legal assistance foundation. Yet the trial court never imposed sanctions.

lished, the party making the communication can overcome the presumed prejudice by showing that the misconduct was harmless beyond a reasonable doubt. *State v. Kell*, 101 Wn. App. 619, 621, 5 P.3d 47 (2000); *State v. Murphy*, 44 Wn. App. 290, 296, 721 P.2d 30, *review denied*, 107 Wn.2d 1002 (1986). Thus, the State had the burden to overcome the prejudice. *Kell*, 101 Wn. App. at 621. Yet, the State did not offer an innocent explanation to the trial court and, on appeal, the State does not address the issue. Accordingly, our record still contains no information as to what the prosecutor whispered. And, we should presume prejudice. *Remmer*, 347 U.S. at 229. The majority concludes that the "record is sufficiently complete overall to allow review of Holmes and [James] Lindsay's claims of prosecutorial misconduct." Majority at 836. But without knowing what the prosecutor said to the jury, I am unable to agree.

## C. PREJUDICE

¶93 The majority finds that the prosecutor committed misconduct by denigrating defense counsel. It also finds that the prosecutor minimized and trivialized the State's burden of proof by using the puzzle analogy, comparing the reasonable doubt standard to everyday decisions, telling the jury it had to find the truth, and commenting on Holmes's testimony. Majority at 837. We have previously reversed convictions where the same prosecutor's office employed the same arguments. *See State v. Walker*, 164 Wn. App. 724, 726, 265 P.3d 191 (2011).

¶94 Nonetheless, the majority reasons that regarding Lindsay, his admission to using "zip ties" to restrain Lawrence Wilkey leaves only a "remote chance" the jury's verdict was affected by the prosecutor's misconduct. Majority at 836. Finally, despite acknowledging that there were "multiple improper statements," the majority rejects the cumulative error doctrine, relying on the reasoning that "cumulative error does not apply where the errors are few and have little

or no effect on the outcome of the trial." Majority at 838. I cannot agree.

¶95 Our Supreme Court recently stated that "deciding whether reversal is required is not a matter of whether there is sufficient evidence to justify upholding the verdicts. Rather, the question is whether there is a substantial likelihood that the instances of misconduct affected the jury's verdict." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 711, 286 P.3d 673 (2012). Thus, the "focus must be on the misconduct and its impact, not on the evidence that was properly admitted." *Glasmann*, 175 Wn.2d at 711. Here, focusing on misconduct as in *Glasmann*, the impact of "powerful but unquantifiable material on the jury is exceedingly difficult to assess but substantially likely to have affected the *entirety* of the jury deliberations and its verdicts." *Glasmann*, 175 Wn.2d at 712.

¶96 In addition, the majority concludes the prosecutor's misconduct was harmless because the court instructed the jury to "disregard any argument not supported by the law" and to " 'disregard any conduct by an attorney that you consider unprofessional.' " Majority at 837, 838 (quoting 53 RP at 4605-06). Generally, we presume the jury will follow the court's instructions, but we analyze possible prejudice from misconduct in the context of the whole argument, the issues in the case, the evidence, and the instructions. *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

¶97 The cumulative effect of repetitive prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect.[31] *State v. Case*, 49 Wn.2d 66, 73, 298 P.2d 500 (1956). Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined trial errors effectively denied the defendant her right to a fair trial, even if each error standing alone would be harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006); *State v. Hodges*, 118

---

[31] For the most part, the trial court did not intervene to stop the behavior.

Wn. App. 668, 673-74, 77 P.3d 375 (2003). In *Walker*, 164 Wn. App. at 739, we held that the prosecutor's improper (1) comments regarding the fill-in-the blank argument, (2) comparing the reasonable doubt standard to everyday decision making, (3) telling the jury that its job was to declare the truth, and (4) misstating the law of defense of others had a cumulative effect warranting reversal.

¶98 Like *Walker*, this case " 'turned largely on witness credibility.' " *Walker*, 164 Wn. App. at 738 (quoting *State v. Venegas*, 155 Wn. App. 507, 526, 228 P.3d 813, *review denied*, 170 Wn.2d 1003 (2010)). Holmes testified that Wilkey did not protest her entering his home and he did not object to her taking her property. She also testified that she had contacted the Idaho police to pursue recovering her property. Lindsay's statement to the police followed the same theme. He told police that he entered the victim's home to help Holmes retrieve her own property. The majority mischaracterizes Lindsay's zip-tie statement as an "admission[ ]." Majority at 836. But because Lindsay denied taking any property that did not belong to Holmes, his statement is not an admission of a crime. Although Lindsay acknowledged he "wrestled around" and "held" Wilkey, he explained that he did so because he believed that Wilkey was "going for the pistol" to stop Holmes and Lindsay from retrieving Holmes's property. Clerk's Papers (Holmes) at 88-89. The majority does not explain what crime, or element of a crime, Lindsay admitted with his zip-tie statement.

¶99 The State charged Holmes and Lindsay with burglary and robbery, alleging that the predicate crime for the robbery was theft of the victim's property. During closing argument, the State argued that the predicate crime for the burglary "could be theft." 95 RP at 8688. Instruction 40 told the jury that a good faith claim of property title is a defense to theft. Thus, if the jury had a reasonable doubt as to whether Lindsay and Holmes intended to commit theft during the incident, it should have acquitted them. Additionally, even if we consider Lindsay's statement to be a

confession, the jury could not consider it against Holmes. *Crawford v. Washington*, 541 U.S. 36, 54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

¶100 Here, as in *Glasmann*, the jury needed to determine the intent of the defendant, thereby determining whether lesser included crimes were the appropriate conviction. *Glasmann*, 175 Wn.2d at 700. The *Glasmann* court found an "especially serious danger" that the misconduct affected the jury's verdict because "nuanced distinctions often separate degrees of a crime." *Glasmann*, 175 Wn.2d at 710. Here, as in *Glasmann*, the defendants conceded much of the conduct but denied the intent elements of the more serious crimes. Based on the prosecutorial misconduct here, I cannot say that "the jury would not have returned verdicts for lesser offenses." *Glasmann*, 175 Wn.2d at 712.

¶101 Prosecutors are more than mere advocates or partisans; they represent the people and act in the interest of justice. *State v. Fisher*, 165 Wn.2d 727, 746, 202 P.3d 937 (2009). Although a prosecutor may act with a " 'fearless, impartial discharge of public duty,' " it must be " 'accompanied by a spirit of fairness toward the accused.' "[32] *Warren*, 165 Wn.2d at 27 (emphasis and internal quotation marks omitted) (quoting *State v. Charlton*, 90 Wn.2d 657, 665, 585 P.2d 142 (1978)). That spirit of fairness is missing here. I agree with the majority that this case is similar to *Steinhardt*, where the trial took on a circus atmosphere and the court gave mild reproofs from which the jury may have believed that the trial court considered the prosecution's tactics to be necessary and proper. *People v. Steinhardt*, 9 N.Y.2d 267, 271, 173 N.E.2d 871, 213 N.Y.S.2d 434 (1961). I am satisfied that the prosecutor's personal attacks on defense counsel, his labeling counsel's closing argument a "crock," and his characterization of Holmes and her testimony ("funny," "disgusting," and "comical") engendered prejudice that infected the whole trial. *See Emery*, 174 Wn.2d

---

[32] Unfortunately for the State, defense counsel has no comparable obligation to ensure that the State receives a fair trial.

at 762. I am also unwilling to gloss over the prosecutor's improper discussion of the burden of proof and reasonable doubt in closing, and his whispered comments to the jury. I would reverse and remand for new trials for both Holmes and Lindsay.

After modification to the unpublished portion of the opinion, further reconsideration denied February 8, 2013.

Review granted at 177 Wn.2d 1023 (2013).